**Eddy Louis FORTE, Appellant,**

v.

**The STATE of Texas, State.**

**Nos. 2–95–011–CR, 2–95–012–CR.**

Court of Appeals of Texas,
Fort Worth.

Oct. 31, 1996.

Rehearing Overruled Dec. 12, 1996.

---

Allan K. Butcher, Fort Worth, for appellant.

Tim Curry, Criminal District Attorney, Betty Marshall, Chuck Mallin, C. James Gibson, Lisa Amos, Assistant Criminal District Attorneys, Fort Worth, for appellee.

Before CAYCE, C.J., and DAY and DAUPHINOT, JJ.

CAYCE, Chief Judge.

## OPINION

Appellant Eddy Louis Forte was convicted of two counts of aggravated robbery and sentenced to thirty years' confinement on each count. In five points of error, appellant alleges: (1) the trial court erred in refusing to suppress the victims' in-court identifications of appellant; (2) the trial court erred by excluding expert testimony regarding the reliability of eyewitness testimony; and (3) the prosecutor impermissibly injected her personal opinion in closing arguments. Because we find that the in-court identifications were independent of any possible pretrial taint, that the reliability of the proffered expert testimony was not established, and that the State's closing argument was in answer to appellant's argument, we affirm the trial court's judgment.

## FACTUAL BACKGROUND

### I. The Kuczek robbery.

On December 13, 1993, Jody Kuczek was washing his car at a self-serve car wash when he noticed a white car with star-shaped tire rims and a spoiler speeding up and slowing down as it passed by the car wash several times. Kuczek then drove home and pulled halfway into his garage. As he was wiping off his car, a man approached him, put a shotgun in his face, and began repeatedly telling Kuczek not to look at his face. When Kuczek looked at the robber's face, the robber pushed him back with the shotgun. Kuczek said he looked right into the robber's eyes then closed his eyes and gave the robber his wallet. The robber left. Kuczek called the police and was able to give them a description that was used for a composite drawing of the robber.

Meanwhile, Detective Eddie Green discovered that a little girl at a nearby elementary school had found some items that had been stolen from Kuczek near appellant's home. Detective Green discovered more of Kuczek's stolen property in a grassy area in front of appellant's home. Detective Green made a photospread based on this information and included appellant's photo. Four days after the robbery, Detective Green showed the photos to Kuczek, and Kuczek chose appellant as the man who had robbed him.

### II. The Ramsey robbery.

On December 21, Roy Ramsey was in his garage unloading groceries from his car. Ramsey heard a noise and turned around to find he "had a shotgun stuck in [his] stomach." Ramsey stated the weapon was a sawed-off, single-barrel shotgun. Ramsey could see the man with the shotgun and an accomplice standing approximately five feet away. In response to the robber's demands,

Ramsey gave the robber his money. The robber left, and Ramsey called the police.

The next day, Ramsey identified appellant as the robber who had the shotgun from the same photospread that Detective Green had shown to Kuczek.

## III. The live lineups.

The same day that Ramsey identified appellant as his robber, Detective Green went to appellant's house to arrest him. Before appellant knew why Detective Green was there, appellant said that he had been at his home "all night last night." Two days later on December 24, Detective Green prepared a live lineup with appellant, other inmates from the jail, and a police officer. Kuczek and Ramsey each chose appellant as their robber. Kuczek and Ramsey also positively identified appellant at trial.

## THE IN–COURT IDENTIFICATIONS

■ In his first three points of error, appellant alleges that the trial court erred in refusing to suppress Kuczek's and Ramsey's in-court identifications because they were tainted by the alleged impermissibly suggestive lineup at the jail.

If an in-court identification has an independent basis other than the suggestive pretrial identification procedure, the in-court identification is admissible. *See Harris v. State*, 827 S.W.2d 949, 960 (Tex.Crim.App.), *cert. denied*, 506 U.S. 942, 113 S.Ct. 381, 121 L.Ed.2d 292 (1992); *Rogers v. State*, 774 S.W.2d 247, 260 (Tex.Crim.App.), *cert. denied*, 493 U.S. 984, 110 S.Ct. 519, 107 L.Ed.2d 520 (1989).

In this case, both Kuczek and Ramsey testified that they identified appellant in court based on their recollections of the robberies. Their identifications were independent of the pretrial lineup. Thus, even if the lineup was impermissibly suggestive, the identifications at trial are admissible because they were independent of the lineup. We overrule appellant's first three points of error.

## EXPERT TESTIMONY

In his fourth point of error, appellant alleges that the trial court erred in excluding the testimony of his expert witness, Dr. Raymond Finn, regarding the reliability of eyewitness testimony. During voir dire, Dr. Finn testified to the following:

● He is a licensed clinical psychologist in private practice. His special training in the area of eyewitness identification comes from self-education, reading the works of others in the field, treating crime victims, and teaching courses in the area of accuracy or memory of eyewitnesses. He has done no "hands-on" tests regarding memory accuracy and has relied on "other people's articles."

● He was told about the facts of the two robberies, and he reviewed copies of the lineup sheets, the photospreads, Kuczek's and Ramsey's testimony at appellant's parole revocation hearing, and the police reports.

● He was not testifying as to the witnesses' truthfulness, but rather how a highly emotional state would affect their ability to remember.

● There is a phenomenon called "weapon focus" that causes a narrowing of perception to the weapon and causes the witness to "miss the rest of the picture." This could have affected Kuczek's identification.

● When people are traumatized, they experience "state dependent learning," which causes them to be less likely to be able to recall details about the traumatic event when they are asked to do so in a calm state. This could have affected Kuczek's and Ramsey's identifications if they were frightened at the time of the robberies.

● "Proactive inhibition of memory" refers to how misidentification can occur when someone looks at a photograph between the crime and a later live lineup. This might have affected the accuracy of Kuczek's identification at the live lineup after seeing appellant in the photo lineup.

● Once the witness has identified someone as their attacker, the witness will have "identification commitment," which makes the witness more confident about their first identification the more they are asked

to identify someone. In other words, once a witness identifies someone, they usually will not budge from that initial identification in later lineups. This confidence does not mean the identification is more accurate. This could have affected Kuczek's live lineup identification.

● Research shows that people are generally less able to identify or remember faces from ethnic groups different than their own. This could have affected Kuczek's and Ramsey's identifications of appellant.[1]

Rule 702 provides that expert testimony is admissible if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." TEX.R.CRIM.EVID. 702. The Texas Court of Criminal Appeals has held that before admitting any expert testimony under this rule, the trial court must first determine that it is both *relevant* and *reliable*.[2] *Jordan v. State*, 928 S.W.2d 550, 553 (Tex.Crim.App.1996); *Kelly v. State*, 824 S.W.2d 568, 572 (Tex.Crim.App.1992).

▪ In *Jordan*, a case involving expert testimony from Dr. Finn that was virtually the same as the proffered testimony in this case, the court stated the standard for relevance as whether the scientific principles that are the basis of the testimony "will assist the trier of fact" and are "sufficiently tied" to the pertinent facts of the case. *Jordan*, 928 S.W.2d at 555; *see Daubert*, 509 U.S. at 591, 113 S.Ct. at 2795, 125 L.Ed.2d at 480–81. Applying this test to the testimony Dr. Finn gave in *Jordan*, the court found that the testimony was relevant. *Jordan*, 928 S.W.2d at 555–56. We are, therefore, constrained to find that Dr. Finn's expert testimony is *relevant* in this case. However, our inquiry does not end there. In determining whether the testimony is admissible, we must also decide whether it is *reliable*.[3]

▪ To find that scientific evidence is reliable, it must be shown that the evidence has as its basis "sound scientific methodology." *Id.* at 555. "This demands a certain technical showing." *Id.* Accordingly, it is through the assessment of reliability that trial courts "weed out" testimony pertaining to "junk science," or otherwise inadequately tested scientific theories. *Id.* While such theories may be shown to be relevant to the facts of a particular case, they do not have a sufficiently sound scientific basis to be reliable. *Id.*

▪ To be considered reliable, evidence based on scientific theory must satisfy three specific criteria pertaining to its validity and application: "(a) the underlying scientific theory must be valid; (b) the technique [or method] applying the theory must be valid; and (c) the technique [or method] must have been properly applied on the occasion in question." *Jordan*, 928 S.W.2d at 554 n. 5; *Kelly*, 824 S.W.2d at 573. All three of these criteria must be proved to the trial court by clear and convincing evidence, outside the presence of the jury, before the evidence may be admitted. *Kelly*, 824 S.W.2d at 573. In attempting to establish the third criterion—whether the technique or method is properly applied on the occasion in question—the expert may rely on facts or data made known to him or her during trial. TEX.R.CRIM.EVID. 703; *see also Jordan*, 928 S.W.2d at 556 n. 8; *Fielder v. State*, 756 S.W.2d 309, 320–21 (Tex.Crim.App.1988) (expert testimony may be based on hypotheticals).

▪ In *Kelly*, the court of criminal appeals identified a list of seven *nonexclusive* factors that a trial court may consider in determining reliability: (1) the extent to which the underlying scientific theory and

1. Appellant is black. Kuczek and Ramsey are white.

2. The federal rule is identical to Texas's expert testimony rule. *Compare* FED.R.EVID. 702 *with* TEX.R.CRIM.EVID. 702. In interpreting the federal rule, the United States Supreme Court has held that it also requires that the evidence be both relevant and reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 2799, 125 L.Ed.2d 469, 485 (1993). The Texas Supreme Court has adopted a similar

two-pronged analysis for determining the admissibility of expert scientific testimony under rule 702. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 550 (Tex.1995); *see* TEX.R.CIV. EVID. 702.

3. The court in *Jordan* did not address the question of whether Dr. Finn's testimony was reliable; it merely found the testimony relevant and remanded the case to this court to address the reliability issue. *Jordan*, 928 S.W.2d at 556.

technique are accepted as valid by the relevant scientific community, if such a community can be determined; (2) the qualifications of the expert testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person who applied the technique on the occasion in question. *Kelly*, 824 S.W.2d at 573. Most of these factors address the soundness of the underlying theory and technique. *Jordan*, 928 S.W.2d at 554. Trial courts may consider other factors that are helpful in determining the reliability of the scientific evidence. The factors a trial court will find helpful will differ with each particular case. *Cf. E.I. du Pont*, 923 S.W.2d at 557 (discussing similar factors for evaluating reliability under the civil rule). As the Supreme Court noted in *Daubert*, rule 702 envisions a *flexible* inquiry focusing solely on the underlying principles and methodology, not on the conclusions they generate. *Daubert*, 509 U.S. at 594, 113 S.Ct. at 2797, 125 L.Ed.2d at 483–84; *see Christophersen v. Allied–Signal Corp.*, 939 F.2d 1106, 1111 (5th Cir.1991) (en banc) (holding in a pre-*Daubert* decision that if the expert's methodology is well-founded, the nature of the expert's conclusion is generally irrelevant to a determination of its admissibility even if it is controversial or unique), *cert. denied*, 503 U.S. 912, 112 S.Ct. 1280, 117 L.Ed.2d 506 (1992).

■ If the trial judge determines that the proffered expert testimony is reliable, then he or she must next determine whether, on balance, that testimony might nevertheless be unhelpful to the trier of fact for other reasons such as the "danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX.R.CRIM.EVID. 403; *Kelly*, 824 S.W.2d at 572; *cf. Daubert*, 509 U.S. at 595, 113 S.Ct. at 2798, 125 L.Ed.2d at 485; *E.I. du Pont*, 923 S.W.2d at 557 (discussing civil rule).

■ In light of the above factors, we find that the appellant in the instant case did not meet his burden of proving either the validity of the scientific theories underlying Dr. Finn's expert testimony or the validity of the method used for applying the theories. There is no evidence that the theories underlying Dr. Finn's testimony are accepted as valid by the relevant scientific community, or that the alleged existing literature on the theories support or reject those theories. Although Dr. Finn stated that there was a "very large body" of literature concerning eyewitness identification, he only mentioned the name of one other person who purports to be an expert in the field and he failed to identify or produce the scientific literature that he allegedly relied on to reach his conclusions.[4] Furthermore, there was no showing that Dr. Finn's eyewitness memory theories have been empirically tested and, thus, whether the technique or methods used to apply the theories are valid. Dr. Finn admitted that he has conducted no studies or research of his own and he identified no one else who has tested or evaluated the theories on which his testimony was based. As a consequence, there is also no evidence of the rate of error in any of the theories Dr. Finn discussed. Based on the record before us, we are compelled to find that Dr. Finn's expert testimony in this case does not meet the guidelines for admissibility of scientific expert testimony[5] because the appellant

4. Appellant urges us to "take judicial notice of a considerable body of scientific literature in this field" that allegedly shows that eyewitness identification is "rooted in a sound scientific basis." Although we may take judicial notice of certain evidence, the evidence must be capable of ready determination by resort to sources whose accuracy cannot be reasonably questioned. TEX.R.CRIM. EVID. 201(b); *cf. Office of Pub. Util. Counsel v. Public Util. Comm'n of Tex.*, 878 S.W.2d 598, 600 (Tex.1994) (interpreting identical rule of civil evidence). The scientific literature that appellant refers us to is not subject to ready determination; thus, we are not permitted to take judicial notice of it.

5. Rule 702 also encompasses "technical, or other specialized knowledge." TEX.R.CRIM.EVID. 702. However, we limit our discussion in this case to scientific knowledge. *See Jordan*, 928 S.W.2d at 553 n. 3; *see also Daubert*, 509 U.S. at 590 n. 8, 113 S.Ct. at 2795 n. 8, 125 L.Ed.2d at

failed to establish its reliability. *Cf.* S.V. v. R.V., 933 S.W.2d 1, 26 (Tex.1996) (Gonzalez, J., concurring) (noting similar reliability problems with testimony about the repressed memory theory). Therefore, the trial court did not abuse its discretion in excluding the testimony. We overrule point of error four.

## CLOSING ARGUMENT

 In his final point of error, appellant argues that the prosecutor impermissibly injected her personal opinion into the case:

[THE STATE]: Defense counsel is trying to suggest that this is a railroad and we are trying to fit a square peg into a round hole. Is that what all those people seemed like to you? Does it seem like we were all here trying to fit their testimony, trying to railroad this person into jail?

No. They seemed like people who were there being honest and telling the truth as they remember it. Of course, there are going to be little things left out and little discrepancies, but the main facts stayed the same. And that's why Detective Green put that note in his report. *Because Detective Green is an honest person.* You saw him on the stand.

[DEFENSE COUNSEL]: Your Honor, I'll object to the prosecutor stating her personal opinion about the detective's honesty or lack of honesty.

THE COURT: Overruled.

[THE STATE]: Use your own common sense. Why would he put that in there?

Putting in the complete picture, putting in all of the details, putting in all of the honest details. But did that stop Detective Green from getting an arrest warrant to go and arrest this man? No. Did it stop him from filing charges on this man? No. That's not a big deal. [Emphasis added.]

Before the complained-of argument, appellant argued that Detective Green noted in his report that there was a discrepancy between Kuczek's and Ramsey's description of their robber and appellant's actual appearance. Appellant argued that this must have been significant because Detective Green included it in the report.

We find that the prosecutor's reference to Detective Green's honesty was a permissible answer to appellant's argument. *Doty v. State,* 820 S.W.2d 918, 923 (Tex.App.—Fort Worth 1991, pet. ref'd). Because the prosecutor's comment was proper jury argument, we overrule point of error five.

## CONCLUSION

Having overruled all of appellant's points of error, we affirm the judgment of the trial court.

DAUPHINOT, J., filed a concurring opinion.

DAUPHINOT, Justice, concurring.

I concur with the result reached in this thoughtful and carefully reasoned opinion. I write from a concern for the collateral consequences of rigidly applying the three-pronged *Kelly* test to all cases in which scientific expert testimony is proffered.

*Kelly* dealt with the admissibility of DNA testing results. *Kelly,* then, involves what, for want of a better term, I call "hard science." As the Court of Criminal Appeals has pointed out in *Jordan,* DNA test results are not reliable if the base theory is flawed or the testing was not performed correctly.[6]

I do not read the *Kelly* test as the exclusive test to be applied in all cases in which a judge is called upon to determine the reliability of expert scientific testimony. The behavioral sciences often play an important part in trial testimony. A small child may exhibit some physical signs of sexual abuse, but those signs are not unequivocal. When, however, the physical manifestations are combined with behavioral manifestations, the combination may lead a trier of fact to an unequivocal conviction that the child has

481 n. 8 (noting that while rule 702 applies to "technical, or other specialized knowledge," discussion limited to scientific expertise because that was the nature of evidence at issue); *E.I. du Pont,* 923 S.W.2d at 560 n. 1 (Cornyn, J., dissenting) (noting that a number of courts have found the inquiry into scientific reliability inapplicable to cases which do not involve "scientific law").

6. *Jordan v. State,* 928 S.W.2d 550, 555 (Tex.Crim. App.1996).

been the victim of sexual abuse. Expert scientific testimony regarding behavioral clues is often offered in such a case. Such evidence from the behavioral sciences may be necessary to help the trier of fact understand the significance of the child's behavior. But this testimony, as well as testimony on subjects such as domestic violence, battered-spouse syndrome, and sexual assaults, is not amenable to the *Kelly* test.

Instead of requiring that an inflexible three-pronged test be applied whenever expert scientific evidence is offered, even though no testing or its equivalent has been performed, I understand *Jordan* to require a flexible approach. As the court points out, the trial court's duty is to weed out junk science and to assure the reliability of the proffered theory.[7] Indeed, the Court of Criminal Appeals has identified a list of non-exclusive factors which the trial court should consider in determining reliability.[8]

As the majority has pointed out, the factors will differ depending upon the facts of the case. This flexible approach, as opposed to an arbitrary test, will allow parties to provide the trier of fact with necessary tools for interpreting the evidence, whether the testimony involves behavioral or hard science.

---

7. *Id.*

8. To the extent that a trial court applies these factors rigidly, though, the same untenable results that occur from mechanically applying *Kelly* would also occur, as Justice Cornyn pointed out:

> Unlike some other scientific theories, theories or opinions about behavior, memory, and psychology depend largely on the subjective interpretation of the expert and usually do not have demonstrable rates of error. Scholars have observed that "the nature of certain social and behavioral science theories may be inherently inconsistent with *Daubert* criteria such as 'falsifiability' and 'error rates'" and that some new theories "have simply not been sufficiently developed as theories to allow for proper consideration of the guidelines offered by *Daubert.*"

S.V. v. R.V., 933 S.W.2d 1, 26 (Tex.1996) (Cornyn, J., concurring) (quoting Richardson et al., *The Problems of Applying* Daubert *to Psychological Syndrome Evidence*, 79 JUDICATURE 10, 11–12 (1995)).