Bryan Boyd McGANN, Appellant,

v.

The STATE of Texas, State.

No. 2–99–160–CR.

Court of Appeals of Texas,
Fort Worth.

Sept. 14, 2000.

Rehearing Overruled Nov. 16, 2000.

Schonemann, Rountree, & Owen, L.L.P., Robert C. Owen, Austin, for Appellant.

Bruce Isaacks, Denton County Crim. Dist. Atty., Pamela Moore Lakatos, Heidi Mason, Denver McCarty, Asst. Dist. Attys., Denton, for Appellee.

Panel B: DAUPHINOT, HOLMAN, and GARDNER, JJ.

## OPINION

ANNE GARDNER, Justice.

### I. INTRODUCTION

Appellant Bryan Boyd McGann appeals his convictions for two counts of solicitation of capital murder. Appellant contends the trial court erred by denying him the opportunity to present his defenses of entrapment and renunciation by excluding expert psychiatric testimony and by failing to charge the jury regarding his renunciation defense. Because the trial court did not err in excluding the Appellant's psychiatric testimony or in denying Appellant's requested instruction on renunciation, we affirm.

### II. FACTUAL BACKGROUND

In November 1996, Appellant's wife of seven years filed for divorce. Several months later, Appellant asked his friend, John Carlson, if he knew someone who could kill his wife. Appellant had known Carlson since 1995 when he had done business with him, and throughout their friendship, Appellant had confided in him regarding his marital problems. Unbeknownst to Appellant, Carlson was a police intelligence source. Carlson shared this information with Rick Sullivan, Chief Deputy Sheriff of Van Zandt County. Sullivan contacted Dennis Cox, an investigator with the Denton County District Attorney's office, and an undercover operation was arranged. In furtherance of this undercover operation, Carlson told Appellant that he had a "buddy" who was a hit-man, and subsequently arranged a meeting between Appellant and the hit-man at a local motel. Two adjacent rooms of the motel were set up for video and sound surveillance. Sullivan, acting as the hit-man, under the alias "Amp," met with Appellant and they agreed upon a $10,000 "contract" price—a $5,000 down payment and a $5,000 final payment upon completion of the job. This first meeting was videotaped and admitted as State's Exhibit 10.

A second meeting was then arranged at another motel. At this second meeting, which was also videotaped and admitted as State's Exhibit 11,[1] Appellant gave $1,600 to Sullivan, made arrangements for the final payment, and supplied detailed personal information about his wife at Sullivan's request, including photos, addresses, her usual daily routine, a description of her vehicle, and locations where she might be found. Appellant supplied Sullivan with his company address in Wisconsin, where Appellant was instructed to send a Federal Express envelope that would contain another pre-addressed envelope. The money was to be placed in the enclosed pre-addressed envelope and sent to a secure site. Sullivan also gave Appellant latex gloves to use when handling the envelope. At the conclusion of this meeting, Appellant reassured Sullivan that he wanted to proceed with the murder and told

---

1. The audio portion of this videotape (State's Ex. No. 11) was inaudible because Appellant turned up the volume on the motel television very loud.

him that, if it went well, he wanted Sullivan to kill his wife's parents also.

Appellant was arrested immediately following this second meeting. He pleaded not guilty to two counts of solicitation of capital murder. The jury found him guilty on both counts and assessed punishment at 35 years' confinement, and a $10,000 fine.

At trial, Appellant asserted the defense of entrapment. In support of his entrapment defense, he contended that Carlson pressured him over a period of months to contact his hit man "buddy" and that the acrimony from Appellant's pending divorce rendered him emotionally weak and exceptionally vulnerable to being entrapped. More specifically, Appellant testified that, as a result of his divorce, he was frantic, frustrated, distressed, and hopeless, and that Carlson's repeated conversations with him about meeting with the hit man induced him to go and meet with Sullivan. Appellant testified that after his first meeting with Sullivan, he was "sick" and drank all afternoon. He testified that he told Carlson that he was not interested in going through with the murder and that, at that time, Carlson responded that it was "no big deal" if he did not want to pursue it. However, Appellant testified that, later, Carlson told him that the hit man was getting agitated because he had "exposed" himself and Appellant should be careful because Sullivan was a dangerous man. Appellant claimed that he continued to see Carlson anyway because of their friendship and business relationship.

Appellant also claimed that Carlson always told him what to say and how to act around Sullivan, and that he followed Carlson's advice because he was scared. He told the jury that he felt compelled to go to the second meeting and give Sullivan some money in order to avoid making Sullivan feel as if Appellant was "yanking his chain." He testified that he was afraid that Sullivan might get angry and hurt him or his children. Finally, Appellant testified that Carlson supplied him with $1,000 of the $1,600 that was tendered at the second meeting.

Appellant further testified that he deliberately paid only $1,600 of the $5,000 down payment at the second meeting because he felt this small, partial payment would prevent the murder from occurring. He testified that he actually had most of the money but pretended not to because he felt the murder would not actually happen until he gave Sullivan all of the money.

To the contrary, Carlson testified that Appellant had ranted and raved for several months about killing his wife. He recalled specifically that, in November 1996, Appellant said, "I want to get the f——ing bitch killed." Carlson testified that he never heard Appellant express that he did not want to go through with the murder and, furthermore, that he never gave Appellant any money to give Sullivan at the second meeting. Instead, Carlson testified that Appellant conveyed to him that money would be no problem.

Sullivan testified that, at the last meeting, when Appellant gave him $1,600, he indicated he was going to go ahead with the murder but Appellant was to make a final payment of $8,500 as soon as the deed was done. He testified that Appellant offered to go to his house to get more money, but Sullivan told him it was too risky and to send it all later.

## III. EXCLUSION OF APPELLANT'S EXPERT TESTIMONY

In his first point, Appellant complains that the trial court erred when it denied Appellant the opportunity to present his entrapment defense by excluding expert psychiatric testimony. To support his entrapment defense, Appellant sought to present the testimony of a psychiatrist, Dr. James Grigson. Outside the presence of the jury, Appellant presented Dr. Grigson with an extensive hypothetical based on the facts previously presented to the jury. Based on this hypothetical, Appellant asked Dr. Grigson to give his opinion regarding whether a normal, law abiding

citizen of average resistance could be induced to solicit the murder of his wife. In response, Dr. Grigson stated:

> Well, you have an individual that's going through an extremely emotional state, difficult period of time. And I'm assuming the child custody is going on, problems are going on throughout the eight or nine months that this is going on. And that the longer it goes on, the more impaired the person's reasoning and judgment would be to withstand manipulation, conning, that type of thing.

Dr. Grigson was then asked whether "a normal, average human being of normal resistance [could] be convinced to go and talk to a hit man and even give him some money based on the hypothetical." Dr. Grigson responded:

> Absolutely.... Even though you're a law abiding citizen, whenever you're into a very nasty divorce or a very contested child custody case, your strongest emotions are—are going to be stimulated. They're going to be brought out. That's going to interfere with the individual's normal reasoning and judgment, so they're more apt to do something they would not do, particularly if you've got somebody pushing them.

Dr. Grigson was then asked about the meaning of Appellant's behavior in bringing insufficient money to close the deal with Sullivan. He stated:

> Oh, it had a tremendous amount of importance. The fact that he was told in March that he had to bring $5,000 at the next meeting and the fact that he doesn't bring it would imply, you know, you're not going to kill my wife.

Finally, Dr. Grigson stated that his expert opinion based upon this hypothetical could be generalized to apply to government targets other than Appellant.

The State objected to this testimony, arguing that the expert testimony was neither relevant nor helpful to the jury. The trial court sustained the State's objection,

excluded Dr. Grigson's testimony, and noted Appellant's objection.

Appellant asserts that he offered Dr. Grigson's testimony in support of his claim that because of his weakened mental state, he was "induced" to commit this offense by Carlson, an agent of law enforcement. He also argues that the testimony was relevant to explain that his act of offering only part of the requested sum of money was consistent with his belief that the murder would not occur if he brought only part of the money. He urges that because of his weakened and confused mental state, his actions were rational for him, even though an ordinary, law-abiding person would not have behaved this way. Appellant contends that the exclusion of his expert testimony unconstitutionally prevented him from presenting his defense of entrapment and constituted reversible error by the trial court.

We review a trial court's decision to exclude evidence under an abuse of discretion standard. *See Jordan v. State,* 950 S.W.2d 210, 212 (Tex.App.—Fort Worth 1997, pet. ref'd). We will affirm if the trial court's decision falls within the zone of reasonable disagreement. *See id.*

The admissibility of scientific expert testimony in a criminal trial is governed by rule 702 of the Texas Rules of Evidence, which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

To be admissible under rule 702, the trial court must require scientific testimony to be *relevant* and *reliable.* *See Jordan v. State,* 928 S.W.2d 550, 553 (Tex.Crim.App. 1996); *Kelly v. State,* 824 S.W.2d 568, 572 (Tex.Crim.App.1992); *Forte v. State,* 935 S.W.2d 172, 176 (Tex.App.—Fort Worth 1996, pet. ref'd). To be relevant, the scien-

tific testimony must be helpful to the trier of fact and be sufficiently tied to the pertinent facts of the case. *See Jordan,* 928 S.W.2d at 555.

 To be reliable, it must be shown that the evidence has as its basis "sound scientific methodology." *Id.* "This demands a certain technical showing." *Id.* Accordingly, it is through the assessment of reliability that trial courts "weed out" testimony pertaining to "junk science," or otherwise inadequately tested scientific theories. *Id.* While such theories may be shown to be relevant to the facts of a particular case, they do not necessarily have a sufficiently sound scientific basis to be reliable. *See id.*

### 1. Relevance

To be relevant, Dr. Grigson's testimony must have been helpful to the jury in understanding the facts as they pertained to Appellant's defense of entrapment. *See id.* Therefore, we must examine the law of entrapment and its application to the evidence.

 Section 8.06 of the Texas Penal Code states that entrapment is a defense to prosecution if the accused:

[E]ngaged in the conduct charged because he was induced to do so by a law enforcement agent using persuasion or other means likely to cause persons to commit the offense. Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment.

TEX. PENAL CODE ANN. § 8.06(a) (Vernon 1994). Section 8.06(b) provides that a "law enforcement agent" includes any person acting in accordance with instruction from local law enforcement agents. *Id.* § 8.06(b). The test for entrapment under section 8.06 is a two-prong test, involving subjective and objective elements. *See England v. State,* 887 S.W.2d 902, 913 (Tex.Crim.App.1994). The first prong is a subjective test in which the accused must show that they were in fact induced by law

enforcement to engage in the illegal conduct. *See id.* This subjective prong requires the accused to show that he was induced to act because of police persuasion. *See id.* The second prong is an objective test in which the accused must show that the conduct that induced him to act would have induced an ordinary person. *See id.*

 In entrapment cases, any evidence tending to make either inducement or persuasion more or less likely than it would be without that evidence is relevant. *See England,* 887 S.W.2d at 909. Subjectively, section 8.06 requires an accused who claims entrapment to produce evidence that he was actually induced to commit the charged offense. *See id.* at 913. Although no Texas cases have specifically addressed the issue, there is federal precedent holding that psychiatric testimony seeking to demonstrate subjective susceptibility to inducement may be relevant and admissible. *See United States v. Nunn,* 940 F.2d 1148, 1149 (8 th Cir.1991); *United States v. Newman,* 849 F.2d 156, 164 (5 th Cir.1988); *United States v. Benveniste,* 564 F.2d 335, 339 (9 th Cir.1977). However, these cases also hold that, even if the psychiatric testimony regarding a defendant's peculiar susceptibilities to entrapment is admissible, the testimony is nevertheless properly excluded if it would "confuse the jury and not shed any light on the issue." *See Nunn,* 940 F.2d at 1149; *Newman,* 849 F.2d at 164–65; *Benveniste,* 564 F.2d at 339.

 In the present case, while Dr. Grigson's testimony may have been pertinent to Appellant's entrapment defense by providing evidence regarding Appellant's vulnerable state of mind at the time of the offense, we find that it could *not* have been helpful to the trier of fact. Expert witness testimony should only be admitted when it is helpful to the jury and limited to situations in which the expert's knowledge and experience on a relevant issue are beyond that of an average juror. *See Duckett v. State,* 797 S.W.2d 906, 914 (Tex.Crim.App. 1990), *overruled on other grounds, Cohn v.*

*State,* 849 S.W.2d 817 (Tex.Crim.App. 1993). However, there is no bright-line standard that delineates issues that are within the comprehension of jurors from those that are not. *See id.* at 917. The evidence shows that, although Dr. Grigson possesses vast experience in the field of psychiatry, including his education, employment, teaching, consulting, and prior testimony as an expert witness, his opinion that the average, law-abiding citizen would be more vulnerable to entrapment when going through a divorce is one which we believe is within the knowledge and experience of an average juror. Specialized knowledge of an expert psychiatrist was not required to render this opinion, and the jury was qualified to intelligently "comprehend the full significance of the evidence." *Id.* at 914. The proffered testimony would not have been helpful to the trier of fact and, therefore, was not relevant. *See Jordan,* 928 S.W.2d at 553. The trial court properly excluded Dr. Grigson's testimony on these grounds.

## 2. Reliability

▩ Even assuming that Dr. Grigson's testimony was relevant and helpful to the jury, it still must satisfy the reliability requirement. To be considered reliable, evidence based on scientific theory must satisfy three specific criteria pertaining to its validity and application: "(a) the underlying scientific theory must be valid; (b) the technique [or method] applying the theory must be valid; and (c) the technique [or method] must have been properly applied on the occasion in question." *Kelly,* 824 S.W.2d at 573; *see Hartman v. State,* 946 S.W.2d 60, 62 (Tex.Crim.App. 1997). All three of these criteria must be proved to the trial court by clear and convincing evidence, outside the presence of the jury, before the evidence may be admitted. *See Kelly,* 824 S.W.2d at 573. In attempting to establish the third criterion—whether the technique or method is properly applied on the occasion in question—the expert may rely on facts or data made known to him or her during trial.

*See* TEX.R. EVID. 703; *Jordan,* 928 S.W.2d at 556 n. 8; *Fielder v. State,* 756 S.W.2d 309, 320–21 (Tex.Crim.App.1988) (expert testimony may be based on hypotheticals).

▩ In determining reliability, the trial court may also consider seven nonexclusive factors that have been identified by the court of criminal appeals: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be determined; (2) the qualification of the expert testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person who applied the technique on the occasion in question. *See Kelly,* 824 S.W.2d at 573; *Forte,* 935 S.W.2d at 177. This is a flexible inquiry, and trial courts may consider other factors that are helpful in determining the reliability of the scientific evidence. *See Forte,* 935 S.W.2d at 177.

In this case, by failing to show that the evidence Appellant sought to elicit in front of the jury had a basis in sound scientific methodology, the Appellant failed to establish the reliability of the evidence. *See Griffith v. State,* 983 S.W.2d 282, 287 (Tex. Crim.App.1998), *cert. denied,* 528 U.S. 826, 120 S.Ct. 77, 145 L.Ed.2d 65 (1999). Evidence that is not reliable is not helpful to the jury because it frustrates rather then promotes intelligent evaluation of the facts. *See id.* at 287–88.

Addressing the three specific criteria pertaining to the validity and application of an expert opinion, Appellant failed to meet the burden of showing a valid theory or application of that theory. First, aside from Dr. Grigson's impressive credentials, Appellant wholly failed to show *any* underlying scientific theory to support his prof-

fered expert opinion. Second, even if Dr. Grigson's testimony concerning the emotional stress and vulnerability concomitant to divorce could be deemed to be a "scientific theory," Appellant failed to provide the trial court with any technique of applying that theory or application of the theory to Appellant. Finally, assuming Dr. Grigson's expert opinion qualifies as a scientific theory, there is no evidence that it is accepted by the relevant scientific community or any supporting literature. *See Forte,* 935 S.W.2d at 177. Therefore, because there is no evidence of underlying technique, application, supporting literature, or acceptance in the scientific community, we believe that the trial court could have properly excluded Dr. Grigson's proffered scientific theory on the basis that Appellant wholly failed to establish its reliability.

In summary, having concluded that Dr. Grigson's opinion regarding Appellant's state of mind was neither relevant nor reliable, we hold that the trial court did not abuse its discretion in excluding his testimony. We overrule Appellant's first point.

### IV. DENIAL OF JURY CHARGE ON APPELLANT'S AFFIRMATIVE DEFENSE OF RENUNCIATION

In his second point, Appellant complains that the trial court erred in denying his requested charge on the affirmative defense of renunciation.

Upon a timely request, a defendant has the right to an instruction on any defensive issue raised by the evidence, whether such evidence is strong or weak, unimpeached or contradicted, regardless of what the trial court may or may not think about the credibility of the evidence. *See Granger v. State,* 3 S.W.3d 36, 38 (Tex. Crim.App.1999); *Darty v. State,* 994 S.W.2d 215, 218 (Tex.App.—San Antonio 1999, pet. ref'd). Therefore, the issue we must decide is whether the renunciation defense was raised by the evidence.

Renunciation is the only specific affirmative defense to criminal solicitation provided in the Texas Penal Code. *See* TEX. PENAL CODE ANN. § 15.04(b) (Vernon 1994). Section 15.04(b) states that it is a defense to prosecution for criminal solicitation that "under circumstances manifesting a voluntary and complete renunciation of his criminal objective the actor countermanded his solicitation or withdrew from the conspiracy before commission of the object offense and took further affirmative action that prevented the commission of the object offense." *Id.* Therefore, renunciation must be voluntary and complete, and it must either avoid commission or prevent commission of the offense. *See Hackbarth v. State,* 617 S.W.2d 944, 946 (Tex.Crim.App. [Panel Op.] 1981).

The renunciation defense to solicitation must occur after all of the elements of the solicitation offense are satisfied. *See* TEX. PENAL CODE ANN. § 15.04(b); *Spakes v. State,* 913 S.W.2d 597, 599 (Tex. Crim.App.1996) (Keller, J., dissenting). The offense of criminal solicitation is completed when the culpable request or inducement to commit a capital felony or a first degree felony is unilaterally presented. *See* TEX. PENAL CODE ANN. § 15.03; *see also State v. Brinkley,* 764 S.W.2d 913, 915 (Tex.App.—Tyler 1989, no pet.). "Proof that the object crime is actually committed is not required to establish the offense of solicitation." *Brinkley,* 764 S.W.2d at 915. "Guilt of solicitation may be established by proving the communication and the culpable intent." *Id.* In Appellant's case, there is no doubt that the solicitation was complete. Viewing the testimony of Appellant, Carlson, and Sullivan, the evidence is uncontroverted that Appellant specifically communicated his desire to have his wife murdered with the requisite culpable intent that the crime be carried out.

However, whether the evidence raised the defense of renunciation is not as simply resolved. The only evidence arguably suggesting Appellant's renunciation is Appellant's testimony that he thought the "job" would not happen because he ten-

dered only a portion of the down payment. Appellant testified that both Carlson and Sullivan told him that the "job" would not happen unless and until he came up with the rest of the money. Appellant testified that he relied on these representations in his belief that because he did not bring the full $5,000 down payment, Sullivan would not only refrain from hurting his wife, but would likewise refrain from harming him or his children.

■ We recognize that a defendant's testimony, by itself, may be sufficient to raise a defensive issue and warrant an instruction. *See Hayes v. State,* 728 S.W.2d 804, 807 (Tex.Crim.App.1987). Moreover, the rule that an accused has the right to an instruction on any defensive issue raised by the evidence is designed to insure that the jury, not the judge, will decide the relative credibility of the evidence. *See Granger,* 3 S.W.3d at 38.

However, there are two reasons we believe Appellant was not entitled to an instruction on the affirmative defense of renunciation. First, the circumstances that Appellant relies upon as evidence that he countermanded the solicitation do not reflect a *complete renunciation* of his criminal objective. *See* TEX. PENAL CODE ANN. § 15.04(b). Secondly, we do not believe Appellant's failure to bring the total amount of the down payment promised to the hit-man constitutes a withdrawal from the conspiracy and "further affirmative action that prevented the commission of the object offense." *Id.*

Appellant never unequivocally testified that he told the hit man that he wanted to abandon the plan. Rather, on direct-examination, when Appellant was asked whether he expressed his desire to abandon the plan to the hit man, Appellant stated, "I'd suggested to him that I thought I might not—if I don't want this done I'll have [Carlson] let him know, but I don't think I want this done. And he doesn't have all the money so he's not going to do it anyway." This testimony hardly manifests a clear intent of Appellant to abandon his criminal objective.

Additionally, despite his argument now that he wanted the plan to cease, at the second meeting, Appellant nevertheless provided the hit man with the "shopping list" of personal information regarding his wife, including her work address, her home address, the address of the children's day care, daily routines, a description of her vehicle, her garage door code, and her parents' address. This is evidence of affirmative action to go forward with the plan, not to prevent the commission of the offense.

Moreover, at the conclusion of the second meeting, Appellant picked up the latex gloves which were to be used to hide any fingerprints on the letter containing the final payment. Although Appellant testified that he picked up the gloves only because the hit man asked him to do so, this action is also indicative of Appellant's intent to pursue his plan. Finally, Appellant testified that, although he could have done so, he made no attempt to notify the authorities or warn family members of the murderous steps he had taken.

In summary, the evidence does not support Appellant's assertion that he renounced his role in the planned murder-for-hire. We do not believe that the evidence indicates that Appellant *manifested* a voluntary and *complete* renunciation of his criminal objective. Nor do we find any evidence whatsoever that Appellant took further *affirmative* action to prevent the commission of the object offense.

We hold that there was no evidence to justify the inclusion of an instruction on renunciation in the jury charge and that the trial court properly refused Appellant's requested charge. We overrule Appellant's second point.

### V. CONCLUSION

Having overruled Appellant's points, we affirm the trial court's judgment.