Arturo HERNANDEZ, Appellant,

v.

The STATE of Texas, Appellee.

No. 13–00–065–CR.

Court of Appeals of Texas,
Corpus Christi.

Aug. 31, 2001.

Guy Williams, Corpus Christi, for Appellant.

Carlos Valdez, Nueces County Dist. Atty., Corpus Christi, Isidro Christian Pineda, Asst. Dist, Atty., Kingsville, for State.

Before DORSEY, HINOJOSA, and RODRIGUEZ, JJ.

## OPINION

DORSEY, Justice.

Appellant, Arturo Chavez Hernandez, appeals from the trial court's judgment revoking his community supervision. The question raised on appeal is whether the trial court abused its discretion in admitting evidence of his urinalysis test results. We reverse and remand.

## I. BACKGROUND

In 1989, appellant pleaded guilty under a plea-bargain agreement to possession of marihuana. The trial court sentenced him to ten years in prison, probated for ten years and a $3,000 fine. On February 9, 1999, the State filed a motion to revoke his community supervision, alleging several violations. This appeal concerns only one violation, count eight, which alleged that appellant failed to avoid the use of drugs, narcotics, or any other controlled substances and tested positive for marihuana on January 28, 1999.

### Revocation Hearing

The trial court heard the motion to revoke on March 4, 1999, at which time the State offered the results of appellant's urinalysis through Alonzo Perez. Perez was a laboratory technician for the Kleberg County Community Supervision & Corrections Department. He tested appellant's urine for the presence of drugs using a machine called an "ADX analyzer". He had worked as a urinalysis lab technician for the department for two and one-half years, with thirty-two hours of specialized training on the ADX analyzer and about two and one-half weeks of extensive on-the-job training. He testified that he had "certain skills" which he gained from being an industrial engineering student at Texas A & M University–Kingsville. When the State's attorney asked him how many urinalysis tests he had performed he replied, "I couldn't say. It's just so many."

When the State offered the results of appellant's urinalysis into evidence defense

counsel objected that the State did not meet the requirements of Rule 702 of the Texas Rules of Evidence. The trial court overruled the objection, and Perez testified that appellant tested positive for cannabinoids (marihuana).

On cross-examination defense counsel questioned Perez about the ADX analyzer as follows:

Q. [W]hat do you know about this machine? Do you know how it works?

A. Well, they have briefed me on all the different kinds of, you know, the technology.

Q. Tell the Court how this machine works that gives you the ability to operate the machine and to come out for a positive test.

A. I enter all the data that's necessary for, you know, for bookkeeping and stuff into our computer, and then I proceed to pipe all the appropriate samples into what you call a flexible access carousel. You take the carousel and you place it in the analyzer and it tests the samples.

Q. And do you know the scientific theory underlying how these samples are tested?

A. The machine uses what you call fluorescence polarization amino acid technology which deals with antigens and antibodies that are in the blood system, and the antigens being the drugs.

Q. And do you know how the machine does that?

A. [W]hat the machine does is, you see, the antigens are in your bloodstream. That's the drugs, but they are not in our system long enough for your body to produce antibodies to attack them so what the company does is they send you reagins which you use which what they do is they inject lab rats with these drugs so they can produce the antibodies, and what happens is the antibodies attach to the antigens and then the drug machine and these antibodies have a fluorescent tag on them, and when light is shown through that is what gives you the reading.

\* \* \* \* \* \*

Q. Do you have any information regarding the reliability of the machine?

A. Yes, I do.

Q. What is that information?

A. [Y]ou can say these results are within 95 to 96 percent competence that they are accurate.

Q. And you know that by reading the brochures on the machine?

A. Well, during my training they teach you these things, and plus they require me to read up on this kind of stuff and learn what I can.

\* \* \* \* \* \*

Q. You don't know how the machine works, correct?

A. The actual technical part of it, no, I don't. I just run it.

After hearing the evidence the trial court found that the State had proven count eight of the motion to revoke. The court also found that the State failed to prove all other violations alleged in the motion to revoke. The trial court revoked appellant's community supervision and sentenced him to ten years in prison and a $3,000 fine.

## II. ANALYSIS

By one point of error appellant asserts that the trial court abused its discretion in revoking his community supervision because the court erroneously admitted the results of his urinalysis. He contends that the State failed to make the Rule 702 showing for admissibility of scientific expert testimony.

## Rule 702

Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

TEX.R. EVID. 702. Pursuant to *Kelly v. State*, 824 S.W.2d 568 (Tex.Crim.App.1992) the proponent of expert testimony or evidence based on a scientific theory must show by clear and convincing evidence that the evidence is (1) reliable and (2) relevant to assist the trier of fact in its fact-finding duty. *Id.* at 572. *See Weatherred v. State*, 15 S.W.3d 540, 542 (Tex.Crim.App.2000). To be reliable, evidence based on a scientific theory must satisfy three criteria: (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied on the occasion in question. *Hartman v. State*, 946 S.W.2d 60, 62 (Tex.Crim.App.1997); *Kelly*, 824 S.W.2d at 573. The ADX analyzer is based on a scientific theory and is, therefore, subject to proof of reliability and relevance under *Kelly*.

Factors that could affect a trial court's determination of reliability include, but are not limited to: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the testifying expert(s); (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique

can be explained to the court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question. *Kelly*, 824 S.W.2d at 573.

We review the trial court's decision under an abuse of discretion standard, which means the decision must be within the zone of reasonable disagreement in light of the evidence offered at the hearing and the requirements of Rule 702. *Id.* at 574. If the trial court is so persuaded then it should admit the evidence, unless the trial court determines that some factor identified in Rule 403 outweighs the probative value of the evidence. *Id.* at 573.

## IV. *Kelly* Factors

1. Scientific Community's Acceptance of Underlying Theory and Technique.

The evidence does not show the extent to which the underlying scientific theory and technique involving the ADX analyzer are accepted as valid by the relevant scientific community. There is also no evidence to show the existence of literature supporting or rejecting the underlying scientific theory and technique.

2. Clarity of the Explanation of the Underlying Technique and Potential Rate of Error.

Perez testified that he entered all the data needed for bookkeeping into a computer and then "pipe[d]" all the appropriate samples into a flexible access carousel. He placed the carousel in the ADX analyzer and it tested the samples. He explained that the analyzer used fluorescence polarization amino acid technology, which dealt with antigens and antibodies in the blood system. He said that the antigens, which are the drugs, are not in the bloodstream long enough for the body to produce antibodies to attack them. Thus the company supplied reagins. He explained

that the antibodies attach to the antigens, and these antibodies have a fluorescent tag on them. This is what provides the reading. According to Perez the results are within ninety-five to ninety-six percent accurate.

3. Perez's Qualifications, Skill, and Experience.

Perez had worked about two and one-half years as a urinalysis lab technician. His specialized training included thirty-two hours of ADX analyzer training and about two and one-half weeks of extensive on-the-job training. He also had "certain skills" which he gained from being an industrial engineering student. Perez operated the ADX analyzer, but admitted that he did not know how it worked.

4. Availability of Other Experts.

Perez was the only witness who testified about the ADX analyzer, and the State offered no evidence about the availability of other experts to test and evaluate the technique.

We can find no reported Texas cases which have decided the admissibility of urinalysis test results produced by an ADX analyzer. Recently, however, in an earlier case involving this same appellant we held in an unpublished opinion that urinalysis test results produced by an ADX analyzer were *not* admissible. *See Hernandez v. State,* No. 13–00–684–CR, 2001 WL 997407, 2001 Tex.App. Lexis 1651 (Tex.App.—Corpus Christi, March 8, 2001, no pet.). The facts of that case were that after the trial court had revoked appellant's community supervision he was released from confinement pending appeal on a $25,000 appeal bond. Afterwards the State alleged that he had violated a condition of his appeal bond by the unlawful use of marihuana. On October 5, 2000, the trial court heard evidence and then re-

voked appellant's appeal bond. He appealed to this Court from that order. The evidence heard by the trial court, upon which it based its decision to revoke the bond, was laboratory results from several urinalysis tests which confirmed the presence of marihuana in appellant's system. Appellant challenged the test results at the hearing on the motion to revoke the appeal bond on the grounds that the State had failed to make a Rule 702 showing that the evidence was trustworthy. In that case the State's witness, Alonzo Perez, testified that he had been trained to operate the ADX machine used to run the tests. He further testified that he did not know the principle or methodology of the machine and did not know how to translate or analyze samples entered into the machine. He further stated that he had a resource for independent verification of the tests run, but that this was not done with respect to the samples in this case. Based upon these facts we held that the trial court abused its discretion in revoking appellant's bond.

▮▮▮ Here the State had the burden to prove by clear and convincing evidence that the testimony of its expert, Alonzo Perez, is trustworthy. *Kelly,* 824 S.W.2d at 573. However the State did not establish (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, (2) the existence of literature supporting or rejecting the underlying scientific theory and technique, or (3) the availability of other experts to test and evaluate the technique. Accordingly Perez's testimony is not trustworthy because his testimony does not satisfy two of the three criteria announced in *Kelly;* that is, the validity of the underlying scientific theory and the validity of the technique applying the theory. *See Kelly,* 824 S.W.2d at 573. Under Rule 702 all three

criteria must be proven to the trial court before the evidence may be admitted. *Kelly*, 824 S.W.2d at 573. We hold that the trial court abused its discretion in admitting Perez's testimony concerning the urinalysis test results. Accordingly the trial court abused its discretion in revoking appellant's community supervision. We sustain the point of error.

We REVERSE the trial court's judgment and REMAND the case to the trial court.

Dissenting Opinion by HINOJOSA, Justice.

HINOJOSA, Justice, dissenting.

The majority holds the trial court abused its discretion in admitting testimony concerning the urinalysis test results and in revoking appellant's community supervision. Because I disagree with the majority's holding, I respectfully dissent.

Under Texas Rule of Evidence 702, the trial court must determine whether proffered scientific expert testimony is "sufficiently reliable and relevant to help the jury in reaching accurate results." *Kelly v. State*, 824 S.W.2d 568, 572 (Tex.Crim. App.1992). The Kelly standard is not limited to novel scientific evidence, but applies to all scientific evidence offered under Rule 702. *Jackson v. State*, 17 S.W.3d 664, 670 (Tex.Crim.App.2000); *Hartman v. State*, 946 S.W.2d 60, 63 (Tex.Crim.App. 1997). The proponent of the evidence must show, by clear and convincing evidence, that the evidence is sufficiently relevant and reliable to assist the fact finder in accurately understanding other evidence or determining a fact issue. *Nenno v. State*, 970 S.W.2d 549, 560–61 (Tex.Crim. App.1998).

To be considered reliable, evidence must satisfy three criteria pertaining to its validity and application: (1) the underlying theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied on the occasion in question. *Kelly*, 824 S.W.2d at 573. All three of these criteria must be proved to the trial court by clear and convincing evidence before the scientific evidence may be admitted. *See id.* To be reliable, it must be shown that the evidence has as its basis "sound scientific methodology." *Jordan v. State*, 928 S.W.2d 550, 555 (Tex.Crim.App.1996). "This demands a certain technical showing." *Id.* Accordingly, it is through the assessment of reliability that trial courts "weed out" testimony pertaining to "junk science," or otherwise inadequately tested scientific theories. *Id.; see Weatherred v. State*, 15 S.W.3d 540, 542 (Tex.Crim.App. 2000) (proponent has burden of proving that the evidence is "relevant and reliable and not mere 'junk science' ").

In determining reliability, the trial court may also consider seven nonexclusive factors that have been identified by the court of criminal appeals: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be determined; (2) the qualification of the expert testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person who applied the technique on the occasion in question. *Kelly*, 824 S.W.2d at 573; *Forte v. State*, 935 S.W.2d 172, 176 (Tex.App.—Fort Worth 1996, pet. ref'd). This is a flexible inquiry, and trial courts may consider other factors that are helpful in determining the reliability of

scientific evidence. *McGann v. State,* 30 S.W.3d 540, 546 (Tex.App.—Fort Worth 2000, pet. ref'd); *Forte,* 935 S.W.2d at 177. Once a particular type of scientific evidence is well established as reliable, a court may take judicial notice of that fact, thereby relieving the proponent of the burden of producing evidence on that question. *Weatherred,* 15 S.W.3d at 542 n. 4; *Emerson v. State,* 880 S.W.2d 759, 764 (Tex.Crim.App.1994).

When we review a trial court's admission of scientific evidence, we apply an abuse of discretion standard. *Prystash v. State* 3 S.W.3d 522, 527 (Tex.Crim.App. 1999); *Griffith v. State,* 983 S.W.2d 282, 287 (Tex.Crim.App.1998). In other words, the appellate court must uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Weatherred,* 15 S.W.3d at 542; *Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Crim.App.1990). Under this standard, we must determine whether the trial court's decision fell within the zone of reasonable disagreement given the evidence presented and the requirements of rule 702. *Kelly,* 824 S.W.2d at 574. The admissibility of scientific testimony is a mixed question of law and fact, and the appellate court is authorized to conduct a de novo review because the issue does not turn on the credibility and demeanor of the State's witnesses. *Jackson,* 17 S.W.3d at 672 n. 8 (citing *Guzman v. State,* 955 S.W.2d 85, 87 (Tex.Crim.App. 1997)); *Hines v. State,* 38 S.W.3d 805, 808 (Tex.App.—Houston [14th Dist.] 2001, no pet.).

The majority opinion holds that the trial court abused its discretion because the testimony of the State's witness. "does not satisfy two of the three criteria announced in *Kelly;* that is, the validity of the underlying scientific theory and the validity of the technique applying the theory," and cites the State's failure to adduce evidence on every one of the seven *Kelly* factors. After reviewing the record, I do not believe the trial court abused its discretion in admitting the testimony concerning the positive results of appellant's urinalysis test for the presence of marihuana for two reasons.

First, such testing has been held by courts in other jurisdictions to be reliable. "[I]t is beyond debate that urinalysis has achieved a sufficient level of scientific reliability to be accepted into evidence by our courts.... Urinalysis technology is hardly novel and has become a conventional means of drug-testing, the results of which have been deemed reliable." *Carter v. State,* 706 N.E.2d 552, 554 (Ind.1999). Furthermore, the ADX technology at issue here has also been held reliable: "The ADX test is a fluorescein polarization immunoassay test (FPIA) that is used to detect marijuana and other drugs in biological fluids. When properly performed, FPIA tests for cannabinoids are generally accurate." *Koenig v. Vannelli,* 971 F.2d 422, 422 (9th Cir.1992) (per curiam) (citing Richard H. Schwartz, M. D., *Urine Testing in the Detection of Drugs of Abuse,* 148 Archives of Internal Medicine 2407 (Nov.1988)); *see Penrod v. State,* 611 N.E.2d 653, 654 (Ind.App.2d 1993) (holding the ADX urinalysis machine "has gained general scientific acceptance"). *Kelly* and its progeny are aimed at preventing mere theory and "junk science" from being presented as true science in the courtroom. *See Weatherred,* 15 S.W.3d at 542. The ADX urinalysis technology is widely accepted in legal, medical and scientific communities, and cannot by any stretch of the imagination be viewed as an unproven theory or "junk science." Furthermore, the list of factors in *Kelly* is nonexclusive, and the *Kelly* test is meant to be flexible. *See Kelly,* 824 S.W.2d at 573; *McGann,* 30 S.W.3d at 546; *Forte,* 935 S.W.2d at 176. Therefore, the trial court was free to con-

sider other factors, including its own knowledge or common knowledge concerning the general acceptance of such testing. The trial court was entitled to rely on such general acceptance, thus relieving the proponent of the burden of producing evidence on that question. *Weatherred,* 15 S.W.3d at 542 n. 4; *Emerson,* 880 S.W.2d at 764.

Secondly, even without considering the test's general acceptance, I conclude the State adduced sufficient evidence to show that the test results in question were reliable. For these reasons, I would hold the trial court's admission of this evidence is "within the zone of reasonable disagreement," and would affirm the trial court's order revoking appellant's community supervision. *Weatherred,* 15 S.W.3d at 542; *Montgomery,* 810 S.W.2d at 391.

Accordingly, I respectfully dissent.