**Dana Marie CONTRERAS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 07–97–0487–CR.**

Court of Appeals of Texas,
Amarillo.

Nov. 27, 2001.

Rehearing Overruled Nov. 27, 2001.

Discretionary Review Refused
April 24, 2002.

William R. McKinney, Jr., Amarillo, for appellant.

Rebecca King, Dist. Atty., John L. Owen, Asst. Dist. Atty., Amarillo, for appellee.

Before BOYD, C.J., and REAVIS and JOHNSON, JJ.

### ON REMAND FROM COURT OF CRIMINAL APPEALS (ON REHEARING)

JOHN T. BOYD, Chief Justice.

Following a remand from the Court of Criminal Appeals, we now affirm the judgment of the trial court in this cause. The procedural history underlying this opinion began when this court reversed the judgment of the trial court. *Contreras v. State*, 998 S.W.2d 656 (Tex.App.—Amarillo 1999) (on reh'g). Subsequently, the Court of Criminal Appeals granted the State's petition for review and, thereafter, reversed and remanded the case back to this

court. *Contreras v. State*, 67 S.W.3d 181 (Tex. Crim.App.2001).

In her initial brief, appellant raised seven issues for our review. The first issue was decided in our original opinion and reported at *Contreras v. State*, 998 S.W.2d 656 (Tex.App.—Amarillo 1999) (on reh'g). For the reasons we stated in that opinion, we remain convinced that our overruling of that issue was correct and we reiterate that ruling. In that opinion, we found appellant's second issue dispositive of her appeal and did not address the remaining five issues. The Court of Criminal Appeals' holding necessitates that we now reconsider the second issue and decide the remaining five.

The nature of appellant's challenges requires us to discuss the facts in some detail. On January 11, 1996, while sleeping, the victim, Neal Winegar, was fatally stabbed by appellant. Winegar was involved and lived with Kenna Andrews, appellant's mother. Kenna testified that she and Winegar met in August 1993, and began living together in October of that same year. However, friction developed between appellant and Winegar, and in December 1994, Kenna asked Winegar to move out. Then, in May 1995, appellant went to live with her stepfather and the next month, Winegar moved back in with Kenna and appellant's sister, Sueletta Andrews. In November 1995, appellant moved back in with Kenna. From that time until Winegar's death, the four lived together. In her testimony, Kenna averred that although appellant and Winegar were always "at odds," Winegar was never violent towards appellant. She also testified that Winegar left all the discipline of the girls to her.

In her testimony, Kenna recounted the events occurring on January 10 and the early morning hours of January 11, 1996. She said that Winegar had taken appellant

to school earlier on January 10. Later in the day, because appellant had just transferred to a new school, Winegar brought over a gas bill to prove appellant's residence. Winegar cooked dinner for the family that evening, but appellant did not join them. Sueletta went to bed between 8:30 and 9:00 p.m. Later, between 11:30 p.m. and 12:00 a.m., Kenna and Winegar also retired.

On January 11 about 1:00 a.m., Kenna was awakened by Winegar, who asked her to speak to appellant.[1] Pursuant to that request, she went to appellant's room and told her to go to bed. The next thing Kenna remembered was that Winegar, moaning, rolled into her on the bed. About the same time, she heard the front door shut and, thinking that appellant might have run away from home as she had done before, Kenna went to check appellant's bedroom. As she suspected, appellant was gone. Before calling the police to report appellant's absence, Kenna went to the bathroom, at which time she noticed blood on her nightgown. She turned on her bedroom light to see where the blood came from and saw Winegar lying in a pool of blood. Kenna went to call 911 to report Winegar's condition but as she did so, she noticed the receiver was off the hook and the 911 operator was already on the line. Winegar was taken to the hospital where he died an hour to an hour and a half later.

Apparently receiving a call from 911 about 3:00 a.m. on January 11, the Amarillo police dispatcher sent Lieutenant Kenneth Farren to Kenna's residence. As Farren arrived at the residence, appellant, apparently coming from a deserted schoolyard to the west of the house, approached and told the officer she was the one who

---

**1.** Appellant testified that she had been ironing in her room and Winegar had come in and told her to go to bed because she was making too much noise.

called, and said, "[h]e's been stabbed." When asked who the victim was, she replied that it was her "stepfather." When Farren asked appellant "[y]our father stabbed your mother or your mother stabbed your father," her reply was, "I stabbed him." Because she was a juvenile, Farren said he did not question her further, but put her in a patrol car while an investigation ensued. Later, as police prepared to take her to the police station, Farren checked her for weapons as well as for physical evidence, such as any transfer of blood from the knife or the victim that might connect her with the crime scene. However, when asked to display her hands, appellant remarked, "[o]h no, I was wearing gloves."

The officers transported her to the police station about 3:46 a.m. and, upon their arrival at approximately 3:54 or 3:55 a.m., they took her to the juvenile division. Potter County Justice of the Peace Terry Miller arrived sometime thereafter, gave her juvenile warnings and, at 5:15 a.m., both Judge Miller and appellant signed a form acknowledging receipt of the warnings. Detective Terrance Tracy then took a written statement from appellant which was completed at 6:05 a.m. About 9:25 a.m., Municipal Judge Donna Clayton came to the police station. A detailed discussion with appellant resulted in her being convinced that appellant understood the nature and contents of her confession and, accordingly, Judge Clayton signed the instrument. There was testimony that although appellant was alone in the room for some periods of time, detectives and other personnel were in close proximity.

Initially, appellant was charged as a juvenile with engaging in delinquent conduct. Subsequently, after the Potter County Court at Law waived its jurisdic-

tion, the case was transferred to the 320th District Court of Potter County, and appellant was indicted for murder. It is that transfer that appellant challenges in her first issue. In doing so, appellant claims the State neither pled nor presented proof that the Potter County Court at Law "had been 'designated' a juvenile court." Specifically, she contends it is a fact issue as to whether that court had been designated a juvenile court, and because of this, "the designation by the juvenile board of Potter County must have been alleged and affirmatively proven" in order for jurisdiction to attach. She bases that argument on the premise that "a juvenile court is not one of general jurisdiction, [and] its power to act is derived exclusively from the statutory authority taken from the **Texas Family Code**." In support of her proposition that factual proof is required, she cites and relies on *In the Matter of A.S.*, 875 S.W.2d 402, 403 (Tex.App.—Corpus Christi 1994, no writ).

■ Appellant's second issue centers around the fact that she was not taken to the police department from the crime scene until 45 to 50 minutes after the police arrived. The ultimate holding of the Court of Criminal Appeals is that the 45–minute delay in taking appellant to the police station cannot be construed as unnecessary.[2] Specifically, the Court of Criminal Appeals deemed the 45–minute delay as "*de minimis*" and "necessary." In reaching its decision, that court reasoned that law enforcement was engaged in "trying to save the victim's life," investigating the stabbing, and securing the scene. The Court of Criminal Appeals believed that six officers, paramedics, Amarillo Medical Services, and the Fire Department were "necessary" in order to

**2.** Determinations of what constitutes "unnecessary delay" fall within the realm of section

52.02(a)(2) of the Texas Family Code and are determined on a case-by-case basis.

properly carry out the listed tasks. Thus, under these circumstances, "unnecessary delay" is not present, and appellant's second issue is overruled.

■ Appellant's third issue contention is the trial court erred in refusing to submit the defense of necessity pursuant to section 9.22 of the Penal Code. That section provides:

### § 9.22. Necessity

Conduct is justified if:

(1) the actor reasonably believes the conduct is immediately necessary to avoid imminent harm;

(2) the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and

(3) a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear.

Tex. Penal Code Ann. § 9.22 (Vernon 1994).

In contending she was entitled to submission of the defense, appellant relies on the testimony of herself and Dr. Anthony Arden. Dr. Arden, a psychologist, was called by the defense as an expert witness. In her testimony, appellant averred that she stabbed the victim "[b]ecause I didn't want him to be with my little sister and I didn't want him to come into my room anymore. I wanted him to stop." Dr. Arden testified that appellant believed Winegar was forcing himself sexually upon her sister and she sought to provide an immediate defense for herself and her sister. He also testified that in his professional opinion, appellant reasonably believed her conduct was necessary to avoid imminent harm to herself and her sister.

In support of her proposition that she was entitled to the charge, appellant claims that the central issue of material fact concerning her defense was whether she reasonably believed that stabbing Winegar was immediately necessary to avoid imminent harm to her and her sister. By being deprived of the charge, she reasons, her defense was irretrievably harmed. In her argument, she points out that in situations where the defense is raised, the reasonableness of an accused's belief is a question of fact to be determined by the fact finder. *Egger v. State*, 817 S.W.2d 183, 185 (Tex.App.—El Paso 1991, pet. ref'd), *citing Fitzgerald v. State*, 782 S.W.2d 876, 885 (Tex.Crim.App.1990), and *Sanders v. State*, 707 S.W.2d 78, 79 80 (Tex.Crim.App.1986). Furthermore, she posits, the reasonableness of an accused's belief must be viewed from the defendant's viewpoint at the time she acted. *Juarez v. State*, 886 S.W.2d 511, 514 (Tex.App.—Houston [1st Dist.] 1994, pet. ref'd). In response, the State contends any belief by appellant that her action was necessary was unreasonable as a matter of law.

Under the statute, to be entitled to the defense, appellant would have to demonstrate that she met all three of the statutory elements of the defense. Under this record, appellant has failed to show her action was immediately necessary to avoid imminent harm. According to her trial testimony, Winegar told appellant to go to bed at about 12:00 a.m. About three or four minutes later, Kenna came to her room and told her it was too late to be up and not to smart off to anyone in the house. At approximately 1:40 a.m., appellant got up and went to the kitchen, where she got a glass of water and a knife, which she carried back to her bedroom. She put the knife on a chair and got back in bed. At that time, she testified that Winegar had not been in her room.

After her return, she said, Winegar came into her room and "pulled back the covers and he reached out to touch me and I rolled over onto my back." She testified he stayed "probably three minutes" and then went into her sister's room and, as she lay on the bed, she thought about killing Winegar. About ten minutes before 3:00 a.m., she went into her mother's bedroom and stabbed Winegar. Although she admitted she had stabbed Winegar, she averred that the last thing she remembered was walking into the room, "him rolling over," and then being on the telephone. She acknowledged she had written a letter to a friend dated January 7, 1996, in which she said, "I made it home okay and I haven't killed Neal yet." This record, particularly in view of the time lapses it shows, is not sufficient to show that at the time appellant stabbed Winegar, killing him was immediately necessary to avoid imminent harm to herself or another person. Because the first condition of the necessity defense was not shown, the trial court did not err in refusing its submission. Appellant's third issue is overruled.

■ Because appellant discusses her fourth and fifth issue contentions together, we will do likewise. In these issues, she posits that the trial court erred in refusing to submit jury charges on self-defense and defense of third persons. Self-defense is codified in section 9.31(a) of the Penal Code, and provides:

### § 9.31. Self–Defense

Except as provided in subsection (b) of this section, a person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force.

Tex. Penal Code Ann. § 9.31(a) (Vernon Supp.2001).

The second, defense of other persons, is found in section 9.32 of the Penal Code, which provides:

### § 9.32. Deadly Force in Defense of Person

A person is justified in using deadly force against another:

(1) if he would be justified in using force against the other under Section 9.31;

(2) if a reasonable person in the actor's situation would not have retreated; and

(3) when and to the degree he reasonably believes the deadly force is immediately necessary;

(A) to protect himself against the other's use or attempted use of unlawful deadly force; or

(B) to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery or aggravated robbery.

Tex. Penal Code Ann. § 9.32 (Vernon Supp.2001).

Appellant claimed at trial that Winegar was sexually abusing her sister, and she was afraid he would abuse her next. She testified that Winegar made her uncomfortable and she did not like the way he looked at her. Even though her sister denied it, as we have noted, appellant testified, and told Dr. Arden, that Winegar had gone into her sister's room the night he was killed and appellant had heard the steel springs on her sister's bed squeak.

For the reasons we have discussed in connection with appellant's third issue, there was no evidence showing the immediacy of any threat posed by the victim. Even under appellant's testimony, Winegar was asleep at the time he was stabbed and could not have presented an *immediate* threat. That being true, appellant was

not entitled to either a self-defense or defense of a third person charge. Her fourth and fifth issues are overruled.

██ In her sixth issue, appellant contends the trial court erred at the punishment stage of trial in refusing to submit the issue of whether the offense was committed under the influence of sudden passion arising from adequate cause pursuant to section 19.02(d) of the Penal Code. To be entitled to the submission of that issue, of course, there must be evidence that she acted under the influence of sudden passion arising from adequate cause. "Adequate cause" is a "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." Tex. Penal Code Ann. § 19.02(a)(1) (Vernon 1994). "Sudden passion" is defined as "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." Tex. Penal Code Ann. § 19.02(a)(2) (Vernon 1994).

In support of her contention under this issue, appellant points to her trial testimony wherein she is asked why she stabbed the victim, and she responded:

> Because I didn't want him to be with my little sister and I didn't want him to come into my room anymore. I wanted him to stop.

> * * *

> I wanted him to stop molesting my little sister and I didn't want him to come after me. I was afraid that he was going to try to be sexual with me and I didn't want him to. When he came into my room, I knew he was going to try. I was afraid of him. I was afraid for my little sister. And no one helped me. No

one cared what I had to say. No one would listen. My own mother didn't even listen. I just wanted it to be over.

She also refers to the testimony of Dr. Arden, who concluded that appellant was suffering from post-traumatic stress disorder because "she was sexually abused and lived in sexual terror over time with a sexual perpetrator." As additional support for her proposition that she was entitled to the sudden passion submission, appellant points to Dr. Arden's testimony that she told him that "an hour or so before the stabbing, that she was asleep in her bedroom ... laying facing the wall. She began to have a sense that there was someone in the room. She rolled over, still keeping her eyes closed for fear of what she might see, she felt the covers removed from her. She felt someone reach down and touch her vaginally." After this, "she lay virtually paralyzed in her bed, listening with great intensity to what might happen then, and she heard Mr. Winegar (the victim) enter [Sueletta's] room, she heard the steel bed springs in [Sueletta's] room." Although appellant did not testify about this at trial, the doctor concluded she was suffering from post-traumatic stress disorder and memories about her own sexual abuse were disassociated, *i.e.*, they were removed from her conscious awareness.

██ Even viewed favorably to appellant, that evidence does not show she acted under the requisite immediate influence of sudden passion. Appellant admitted in her trial testimony that she had taken a knife from the kitchen, then returned to her room and set the knife in a chair. When asked by several people whether Winegar had ever sexually abused her, she denied it. Dr. Arden's explanation for this was that she had lost her memory of this event due to post-traumatic stress disorder

and only remembered it during a "flashback." This type of evidence is not sufficient to show that appellant stabbed the victim directly as a result of, and arising out of, provocation at the time of the offense. *See Hobson v. State,* 644 S.W.2d 473, 478 (Tex.Crim.App.1983). Passion solely arising from a former provocation will not qualify. *Id.* Appellant's sixth issue is overruled.

■ In her seventh and final issue, appellant claims the trial court abused its discretion in admitting prosecution exhibits 4 and 13 because they were "gruesome, full-color autopsy photographs" which had no relevance to any issue in the case. Moreover, she argues, the exhibits "would leave a person of normal sensibilities with the impression that Appellant almost cut the deceased in half with a chain saw as opposed to stabbing him one time in the heart." Predictably, in response, the State claims the photographs aided the jury in understanding Dr. Frost's testimony.

In explaining the four admitted photographs out of the 19 tendered, Dr. Frost testified:

> Well, State's Exhibit 13 is a depiction of the large medical incision of the chest, the thoracostomy incision.
>
> Exhibit[s] 23 and 24 both display the injury to the heart, the stab wound to the chest also penetrated the right ventricle of the heart, one of the heart chambers, and caused a defect there a little over an inch in length.
>
> And Exhibit 4 is just another view of the stab wound and the chest wall incision from a greater distance. . . .

■ A trial court's decision to admit a particular piece of evidence, over objection, is measured by an abuse of discretion standard. *Montgomery v. State,* 810 S.W.2d 372, 379 (Tex.Crim.App.1990) (on reh'g). In turn, whether it abused its discretion depends on whether the decision fell within the zone of reasonable disagreement. *Id.* at 391–92. Admissible evidence must possess some probative value and that probative value must not be substantially outweighed by its inflammatory nature. *Long v. State,* 823 S.W.2d 259, 272 (Tex.Crim.App.1991), *cert. denied,* 505 U.S. 1224, 112 S.Ct. 3042, 120 L.Ed.2d 910 (1992). Furthermore, indicia such as gruesomeness, number, detail, size, color, and perspective are relevant in assessing whether an abuse of discretion is shown. *Santellan v. State,* 939 S.W.2d 155, 171–72 (Tex.Crim.App.1997); *Narvaiz v. State,* 840 S.W.2d 415, 429 (Tex.Crim.App.1992), *cert. denied,* 507 U.S. 975, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993).

As we have noted, appellant only challenges two of the four photographs admitted. Exhibit 4 is a photo of Winegar that shows his body from the top of his head to his thigh area. According to Dr. Frost, the exhibit shows the stab wound from a view farther back than just the heart itself, as in State's Exhibit 23 and 24. While it does show a long cut across his chest that was done for medical purposes, it is not especially gruesome and is not redundant of any other photograph. Exhibit 13, the other challenged photo, is a close-up of the heart as seen through the cut across the victim's chest, and it also shows the stab wound which appears right above the heart. The photograph has a ruler right next to the stab wound which shows the length of the wound. While it is true that pictures showing a homicide victim are to some extent gruesome, we cannot say the pictures were "so horrifying or appalling that a juror of normal sensitivity would necessarily encounter difficulty rationally deciding the critical issues of the case after viewing them." *Narvaiz,* 840 S.W.2d at 429. That being so, we cannot say the record shows the trial court abused its

discretion in admitting the photographs. Appellant's seventh issue is overruled.

In final summary, all of appellant's issues are overruled, her motion for rehearing is overruled, and the judgment of the trial court is affirmed.