**In the Matter of E.C.L.**

**No. 14–06–01106–CV.**

Court of Appeals of Texas,
Houston (14th Dist.).

Feb. 12, 2009.

Christopher L. Tritico, Michael Essmyer, Ron S. Rainey, Houston, for appellant.

William Hawkins, Alan Curry, Houston, for appellee.

Panel consists of Justices YATES, ANDERSON, and BROWN.

## OPINION ON REHEARING

JEFFREY V. BROWN, Justice.

Appellant's motion for rehearing is overruled. The opinion issued December 11, 2008, is withdrawn and the following opinion is substituted therefor.

Appellant E.C.L. was charged with engaging in delinquent conduct for fatally shooting his father, Rick Lohstroh. A jury found he engaged in delinquent conduct and assessed punishment at ten years' confinement in the Texas Youth Commission with a possible transfer to the Texas Department of Criminal Justice. In ten issues, he contends the trial court erred in (1) denying requested jury instructions on the defenses of necessity, self-defense, and defense of others, (2) excluding expert testimony, (3) denying requested jury instructions on lesser-included offenses, and (4) overruling his objections to prosecutorial misconduct. E.C.L. further contends that his sentence is unconstitutional. We reverse and remand for a new trial.

## I. BACKGROUND

Dr. Rick Lohstroh and Mrs. Deborah Geisler were married on June 16, 1989. Almost from the beginning of their marriage, Lohstroh and Geisler verbally and physically abused each other to the degree that peace officers were called to their home on more than 20 occasions resulting in the arrest of both spouses at varying times.

On January 21, 1994, Geisler gave birth to E.C.L., their first son. K.L., appellant's brother, was born two years later. Geisler testified that during their marriage, Lohstroh was arrested seven times. E.C.L. was present on all but one of those occasions. Moreover, both children witnessed several instances in which their parents were abusive to each other.

On one such occasion, when E.C.L. was six years old, his parents were engaged in an argument that escalated into Lohstroh wielding a hammer while chasing Geisler through the house. Geisler ran into the master bedroom and Lohstroh pinned her to the bed with one arm against her throat and the hammer in the other hand. E.C.L. followed his parents into the bedroom, picked up the phone, and begged his mother to call the police. The police were eventually summoned, but neither party was arrested.

Another incident in which police were called occurred on January 2, 2002. Geisler had scheduled a family outing to play laser tag in celebration of E.C.L.'s eighth birthday. Lohstroh thought he had been excluded from the party and became angry. Both parents argued about the trip to laser tag and began shouting at each other. Lohstroh picked up a burrito and threw it at Geisler. Geisler ducked and the burrito hit the floor. While his par-

ents were still arguing, E.C.L. retrieved a small broom and dust pan and began to clean up the spilled food. Lohstroh became angry, picked up the broom and dust pan, and threw them at E.C.L. The police later interviewed both E.C.L. and his brother about the incident. Lohstroh was arrested and charged with assault. Afterward, Lohstroh moved out of the parties' residence and, on January 30, 2002, filed for divorce.

On April 1, 2002, Geisler discovered E.C.L. and his brother together, both naked from the waist down. She testified that they were discussing "sexual types of behavior." When she asked them why they were behaving in that way, E.C.L. said that someone had taught him to do that. After questioning E.C.L. further, Geisler reported to Children's Protective Services (CPS) that E.C.L. had been sexually abused by Lohstroh in a motel room in Webster. CPS in turn referred the report to the Webster Police Department. This began a long investigation into alleged sexual abuse, which required E.C.L. to be interviewed by CPS workers, a counselor, and police officers. The police report indicated that the charges could not be substantiated and the Harris County District Attorney's Office filed no charges. Geisler also reported the alleged abuse to authorities in Galveston County, claiming that it had occurred in their home in Friendswood. The Galveston County District Attorney's Office also declined to file charges. Although no charges were filed in either county, Dr. Joseph Glenmullen, a psychiatrist who examined E.C.L., testified that E.C.L. believed he had been sexually abused.

As a result of the sexual-abuse allegations, Lohstroh was denied visitation with the children, but in September 2002, he regained visitation rights. On October 4, 2002, Lohstroh retrieved both boys from after-school care in violation of a protective order. As a result, criminal trespass charges were filed against him. On November 14, 2002, Geisler reported to the police that Lohstroh had grabbed E.C.L. by his arm and forcefully pulled him into Lohstroh's car. On the drive to Lohstroh's home, E.C.L. said he did not want to go to his father's house. Lohstroh hit E.C.L. while they were in the car, and after they arrived at Lohstroh's home, he hit E.C.L. so hard that E.C.L. fell and hit his head on the armrest of a sofa. Charges were not filed against Lohstroh. After these allegations were made, E.C.L. began seeing Dr. Sherri Corning, a psychologist. Dr. Corning treated E.C.L. for about one and a half years.

On November 18, 2002, Geisler went to Lohstroh's girlfriend's place of business, told the girlfriend's colleagues that Lohstroh was a child molester, and told the girlfriend to stay away from her children. As the girlfriend left work that day, Geisler and the two boys were in Geisler's car outside the girlfriend's place of employment. Geisler followed the girlfriend in her vehicle, driving recklessly, running red lights, and following at an unsafe distance until the girlfriend neared a police station. As a result of this incident, Geisler was charged with neglectful supervision.

On April 8, 2003, E.C.L. told his mother that Lohstroh had been very angry with him two days earlier when E.C.L. refused to take a bath. E.C.L. reported that Lohstroh chased him into the bathroom with a belt, grabbed his arm, and forcibly removed his shorts. Lohstroh then beat E.C.L. across the buttocks. Lohstroh then grabbed E.C.L. by the arm, jerked him off his feet, and attempted to force him into the bathtub, leaving a bruise on E.C.L.'s elbow. E.C.L. dressed himself and ran out of the bathroom. When Geisler reported this incident to the police,

E.C.L. reported to them that he was afraid to take a bath because of a previous molestation by his father.

On April 24, 2003, peace officers were dispatched to the mother's home where Geisler reported that E.C.L. had been at his father's apartment for visitation the previous day and that Lohstroh had hit E.C.L. in the face. E.C.L. said he asked his father four times if he could play a video game and each time his father told him no. After the fourth time, Lohstroh hit E.C.L. in the face. The officer examined E.C.L.'s face and did not see any marks or bruises. In his report, the officer stated, "Due to my past experiences with Mrs. Geisler I did not see any reasons to pursue the issue of assault on the nine year old boy. I told Mrs. Geisler that [E.C.L.]'s father had the right to discipline his child as long as it was not excessive."

In another police report filed May 14, 2003, Geisler accused Lohstroh's girlfriend of physically abusing K.L. In that report, the officer recounted the previous assault against E.C.L. and noted:

> [Father] has some history of sexual abusing [E.C.L.] in the past and CPS investigated. [Father] also has some history of physically abusing [E.C.L.] as well. There is concern that [E.C.L.] and [K.L.] are still at risk for physical abuse especially because [Father] has a condition called an intermittent explosive disorder. This causes him to have outbursts of anger and [Father] is not taking his medication.

The officer concluded that both parents "have inappropriately disciplined 9 and 6 [year olds]. There is a lot of history with this family involving physical abuse as well as sexual abuse. [Father] is not medicating his mental health disorder and this could place the children at further risk."

On May 21, 2003, the divorce became final. Lohstroh and Geisler shared custody of the children on alternating weeks. In other words, the children lived with their father for one week and their mother the next week. Every Friday the children switched homes. During the school year the transition took place at school. During school breaks, however, each parent would pick up the children at the other's home.

Deputy Harris County Constable Christopher Kithas testified that he was called to Geisler's home on three occasions to assist in the transfer of custody. Each time the children did not want to get in the car with their father. On the first occasion, the children were inside the house and would not come out. Eventually Deputy Kithas was able to coax them out and convince them to go with their father. On another occasion, Lohstroh was sitting in the driver's seat of the car, K.L. was sitting in the back seat, and E.C.L. was outside of the car spraying Lohstroh with a water hose. Again, the boys eventually left with their father. On a third occasion, the boys refused to get in the car and Lohstroh finally left without them. On each occasion, Geisler remained in the house and did not assist the children or their father with the transfer of custody. K.L. testified that on one occasion he and E.C.L. jumped from their father's moving car after Lohstroh began to drive away because they did not want to go with him.

On December 19, 2003, Geisler reported to the Friendswood Police Department that her children had witnessed Lohstroh strike his girlfriend. The police interviewed both children. E.C.L. said he had seen his father strike his girlfriend after an argument about the dishes not being washed. According to the police report, while the investigating officer was questioning E.C.L., Geisler interrupted and said, "What I'm really concerned about is that R. Lohstroh spanked my sons." The officer asked E.C.L. about the spanking

and E.C.L. reported that he had been struck three times with a leather belt because he and his brother would not go to bed. Geisler then told the officer that as Lohstroh struck the children, he said, "I'm going to kill y'all." Neither of the children initially reported having heard this, but when the officer asked if Lohstroh had said it, they first looked at their mother and then responded, "Yes." After a thorough interview, the officer referred the incident to the detective division.

In July 2004, E.C.L. began to see Dr. Diane Treadwell–Deering, a psychiatrist at Texas Children's Hospital. Dr. Treadwell–Deering determined that E.C.L. suffered some signs of depression, but was not clinically depressed. After his second appointment, Dr. Treadwell–Deering prescribed Prozac, an anti-depressant medication. The prescription dose started at 10 milligrams and was gradually increased to 20 milligrams. Because of the custody arrangement, Geisler expressed concern that E.C.L. would not receive the medication during the weeks he lived with his father. Dr. Treadwell–Deering attempted to contact Lohstroh and discuss the medication with him, but Lohstroh did not return her calls. Because she was unable to communicate with Lohstroh, Dr. Treadwell–Deering prescribed a once-weekly 90–milligram dose of Prozac to be given to E.C.L. by his mother every Friday.[1] Dr. Treadwell–Deering recommended that E.C.L. see a psychologist.

On Friday, August 27, 2004, Geisler administered to E.C.L. his second 90–milligram dose of Prozac. That same day, E.C.L. and his brother had an appointment with Dr. Charles Patrick Brady, a psychologist. In preparation for the appointment, Geisler told E.C.L. to write down anything he wanted to discuss with Dr. Brady. In the document he prepared, E.C.L. stated:

1. I'm angry because I have to go live at my dads "rick's". It upsets me a lot to stay at rick's.

2. Rick yells and screams at us a lot.

3. Katy [Lohstroh's girlfriend] calls us names like turd, brats, pigs, nerds. There is a lot of yelling at rick's house.

4. Rick hits us swing his fists at our head, w[h]ips us with belts, he's hit me and knocked me down he hits because he is mad. he's given us bruises and cuts.

5. he yells at katy using bad word he has also hit her and Katy has hit him "sometimes". He also yells about her smoking.

6. When rick comes to pick us up at mom's house, He yells and screams at us. He grabs [K.L.], hurting [K.L.] and forces [K.L.] into his car. I try to protect [K.L.].

7. Rick yells and screams bad words at other drivers. Rick swerves the car, his slams on the brakes in front of other drivers to make them mad or because he is mad. He also does bad hand movements to other drivers and other people.

8. One time Katy shoved me out the back door at night and locked me out of the house. [K.L.] was the one who let me back in the house she broke glass. Katy w[h]ips

---

1. At trial, E.C.L. asserted an involuntary-intoxication defense alleging that 90 milligrams of Prozac was an overdose for a ten-year-old or, in the alternative, that Geisler mistakenly gave E.C.L. two 90–milligram capsules of Prozac on the day of the shooting. Under either theory, E.C.L. alleged that the side effects of Prozac caused him to not be culpable for his actions. This theory was submitted to the jury and rejected. On appeal, E.C.L. has not challenged the jury's rejection of his involuntary-intoxication defense.

[K.L.] with a belt and I can not stop her from hurting [K.L.].

9. Rick has pictures of naked women on his computer that pop up. Then Rick has tapes of naked women.

10. I think Rick is doing bad things to [K.L.] like he did to me. When I come home from school sometimes rick has [K.L.] in ricks bed and rick is in his underwear. [K.L.] is quiet and sad. Rick is acting strange. [K.L.] has told me what rick has done and I can not protect [K.L.] from this happening. No one could protect me when this was happening.

11. [K.L.] and I have both been sick and rick does not take us to see our doctor. I had fever for 4 days and rick did not help me. [K.L.] had fever a skin infection, sore throat, and rick did not take us to the doctors.

12. I am afraid of rick and living at ricks house. I wish I could make things better and protect [K.L.]. I want to live at my mom house so bad things don't countinue [sic] to [K.L.] and me. (Katy carried a machete around rick's house and said "I was going to rip up your dad".) I don't feel safe at rick's house because he is angery [sic] a lot and is doing bad things.

Dr. Brady discussed the contents of the note with E.C.L. He asked specifically about the allegations of sexual assault and determined that E.C.L. believed that Lohstroh had sexually assaulted him. Dr. Brady also determined that E.C.L. believed that Lohstroh was going to sexually assault his brother. After meeting with E.C.L., Dr. Brady met with Geisler and instructed her that she should report to CPS both the allegations in E.C.L.'s note and those he made in the session concerning sexual assault.

On the way home from Dr. Brady's office, Geisler asked K.L. about the sexual-assault allegations. When K.L. initially denied having been assaulted, E.C.L. became agitated and angry with him. E.C.L. later admitted to Dr. Glenmullen that the agitation was out of character for him. Also on the way home, Geisler's car ran out of gas, which required Geisler and the children to wait one to two hours for a tow truck to take them to a service station. As soon as the children arrived home, they had to prepare to move to their father's house for the next week.

While the children were preparing to leave, Geisler called CPS to report the allegations of sexual abuse. While on the telephone with CPS, Geisler received a call from Lohstroh informing her that he had arrived and was ready for the children. Geisler and Lohstroh then engaged in a heated argument over the telephone. K.L. testified that E.C.L. went outside to the car with his backpack while Geisler was tying K.L.'s shoes. K.L. heard three loud pops and E.C.L. came back in the house with a gun in his hand. With his other hand, E.C.L. made an "OK" sign. Geisler took the gun away from E.C.L. and K.L. went to the bedroom because he was frightened. Geisler asked E.C.L. what he had done and he replied, "I shot him."

Geisler called 911 and told responding officers that Lohstroh was alive, but his breathing was labored and shallow. Emergency medical technicians attempted to treat Lohstroh, but by the time they arrived he had stopped breathing. An autopsy revealed that Lohstroh died as a result of gunshot wounds to the back. Police officers separated E.C.L. from his mother and his brother and placed bags on each of their hands. Tests revealed gun-

shot residue on both of E.C.L.'s hands and on Geisler's right hand.[2]

At 8:30 that evening, E.C.L. gave a statement to Harris County Sheriff's detectives. As part of the statement, E.C.L. told the detectives that he talked to psychologists about things that bother him. When asked what things bother him, he responded, "A lot of things like the abuses, Rick abuses me and [K.L.]. I think he's sexually molesting [K.L.] and that bothers me a lot." E.C.L. described the sexual abuse just as he had described it to CPS workers, psychologists, and other police officers. He told the detectives that he was sexually abused when he was seven years old. E.C.L. also stated that Lohstroh hits them when he is mad. He said that he does not like the way the Prozac makes him feel and that it makes him more talkative and "[a] little on the side of angry." The detectives asked E.C.L., "What happened after Rick got here today?" E.C.L. whispered in response, "I was mad that I had to go with him so I shot him." E.C.L. said he retrieved the gun from his mother's closet in her bedroom, loaded it, and put it in his backpack. When Lohstroh arrived, E.C.L. said he did not really want to go with his father, but he went outside, sat in the back seat of the car, put his hand in the backpack, and shot Lohstroh. After the first shot, he took the gun out of the backpack. Lohstroh began screaming, which scared him and he shot two more times while in the car, then got out of the car and shot once toward the back door. He then ran inside the house where his mother took the gun away from him. When asked whether he was afraid of Lohstroh, E.C.L. responded, "Yes, oh yeah I was scared of him. When he'd get

angry I was real scared that he would turn around and just go crazy on us hit us and abuse us." When asked why his father came to get him every week, E.C.L. responded, "I don't know. I don't, I just think he thinks that we're like a prize to him not as loved but like he as if he were playing a game."

E.C.L. was charged and convicted with engaging in delinquent conduct by shooting Lohstroh with a deadly weapon. The jury assessed punishment at ten years' confinement in the Texas Youth Commission with a possible transfer to the Texas Department of Criminal Justice. In ten issues, E.C.L. challenges his conviction on the grounds that the trial court erred in (1) denying his requested jury instructions on the defenses of necessity, self-defense, defense of another, and the lesser-included offenses of manslaughter and criminally negligent homicide, (2) improperly excluding expert testimony, and (3) overruling his objections to prosecutorial misconduct. Because the issues of expert testimony and jury instructions on the justification defenses are dispositive, we will address only those issues.

## II. Evidence That Force was Immediately Necessary

In his fourth issue, E.C.L. contends the trial court erred in excluding certain expert testimony. At trial, E.C.L. attempted to use expert testimony to produce evidence of the justification defenses of self-defense and defense of another. *See* Tex. Penal Code Ann. §§ 9.31 & 9.32 (Vernon Supp.2008).

---

**2.** When initially asked, outside the presence of the jury, whether she shot Lohstroh, Geisler did not immediately respond and eventually invoked her Fifth Amendment privilege against self-incrimination. Later, in front of the jury, when asked again whether she shot Lohstroh, Geisler answered, "No." At trial, appellant did not pursue the potential culpability of Geisler in the shooting.

### A. Standard of Review

Under article 38.36 of the Texas Code of Criminal Procedure, if a defendant raises a defense of justification provided by section 9.31, 9.32, or 9.33 of the Penal Code, the defendant, to establish his reasonable belief that use of force or deadly force was immediately necessary, shall be permitted to offer (1) relevant evidence that the defendant had been the victim of family violence committed by the deceased, and (2) relevant expert testimony regarding the defendant's state of mind at the time of the offense. Tex.Code Crim. Proc. Ann. art. 38.36(b) (Vernon 2005). A trial court's ruling on the admissibility of evidence is subject to an abuse-of-discretion standard on appeal. *Sexton v. State,* 93 S.W.3d 96, 99 (Tex.Crim.App.2002). We uphold the trial court's ruling if it is permissible under any theory applicable to the case. *Romero v. State,* 800 S.W.2d 539, 543 (Tex.Crim.App.1990).

### B. The trial court erred in excluding expert testimony on E.C.L.'s belief that force was immediately necessary.

E.C.L. attempted to introduce the expert testimony of Dr. Joseph Glenmullen that because E.C.L. suffered from battered-child syndrome, he believed his conduct was immediately necessary to avoid harm to himself or his brother. The trial court excluded any testimony from Dr. Glenmullen about whether E.C.L. believed force was immediately necessary at the time he shot his father. E.C.L. proffered expert testimony from Dr. Glenmullen that:

- E.C.L.'s mental condition and state of mind was such at the time he shot his father that he reasonably believed he was justified in using force or deadly force to protect himself or his

brother against the unlawful acts of his father.

- At the time he shot his father, E.C.L. did not believe he could retreat.

Ordinarily, the defendant is the only source of evidence of his or her state of mind at the time the offense is committed. *See Osby v. State,* 939 S.W.2d 787, 791 (Tex.App.-Fort Worth 1997, pet. ref'd). But, article 38.36(b) of the Code of Criminal Procedure authorizes admission of "relevant expert testimony regarding the condition of the mind of the defendant at the time of the offense" if the defendant had been a victim of family violence and if the defendant raised the issue of self-defense or defense of another. Tex.Code Crim. Proc. Ann. art. 38.36(b).

The reference to expert testimony in article 38.36(b) is a codification of *Fielder v. State,* 756 S.W.2d 309 (Tex.Crim.App. 1988). In *Fielder,* the Court of Criminal Appeals held that expert testimony about the psychological effects of marital abuse is relevant to a defendant's claim of self-defense because the expert testimony could assist the jury in its decision concerning whether the defendant reasonably believed that deadly force was immediately necessary. *Id.* at 318–20. The court found that expert testimony was relevant because the average lay person "has no basis for understanding the conduct of a woman who endures an abusive relationship." *Id.* at 321.

In this case, the State attempts to distinguish *Fielder* because it claims there is no evidence to suggest that E.C.L. believed he immediately needed to respond to an imminent threat from his father. To the contrary, there was sufficient evidence introduced from which an expert could opine as to E.C.L.'s state of mind. The average lay person had no basis for under-

standing why E.C.L. would fear for his life by simply getting into the car with his father. At the time E.C.L. sought to introduce Dr. Glenmullen's expert testimony, the jury had heard that E.C.L. spent most of his 10 years being verbally and physically abused by his father. Although prosecutors never pursued any allegations of sexual abuse in the courts, several experts testified that E.C.L. believed he had been sexually abused. On at least one occasion E.C.L. jumped from a moving vehicle to avoid going with his father. On three occasions when E.C.L. expressed his desire not to go with his father, law-enforcement officers were called to force E.C.L. to get into his father's car. To the extent that an expert can explain a child's endurance of this level of abuse and the nature of his fear at the time of the shooting, his testimony was of "appreciable aid" to the trier of fact. *See id.* at 321.

The State contends that Dr. Glenmullen's testimony should have been excluded for the same reasons similar testimony was excluded in *Werner v. State,* 711 S.W.2d 639 (Tex.Crim.App.1986). In that case, Werner sought to admit expert testimony on the "holocaust survivors' syndrome" in support of his claim of self-defense. The court held, however, that Werner, an adult who had no prior relationship with the deceased, had not presented evidence that he reasonably believed it necessary to shoot the deceased to defend himself against deadly force. *Id.* at 644–45. The court held that Werner was not entitled to admission of the expert testimony because the evidence did not raise self-defense as an issue. *Id.* at 645.

In this case, E.C.L. sought to introduce evidence that a reasonable person will have a just apprehension of fear of another with whom he has had prior violent conflict. Dr. Glenmullen's testimony was relevant to E.C.L.'s state of mind, which had been profoundly affected by the sum of his experiences with his father. Lay people, especially adults, who have not experienced abuse for most of their lives do not have a frame of reference to fully understand why a child in E.C.L.'s position might have felt that deadly force was immediately necessary to protect himself and/or his brother. Therefore, Dr. Glenmullen's testimony was admissible under article 38.36(b) to aid the jury in understanding E.C.L.'s fear at the time of the offense. *See Fielder,* 756 S.W.2d at 321; Tex.Code Crim. Proc. Ann. art. 38.36(b).

■ In its brief on appeal, the State also contends that the trial court's ruling was correct because E.C.L. failed to establish Dr. Glenmullen's reliability as an expert. *See McGann v. State,* 30 S.W.3d 540, 546–47 (Tex.App.-Fort Worth 2000, pet. ref'd). In determining the admissibility of novel scientific evidence, the threshold question asked under both Rule 702 and *Kelly v. State* is "whether that testimony will help the trier of fact understand the evidence or determine a fact in issue." *Kelly,* 824 S.W.2d 568, 572 (Tex.Crim.App. 1992); *see also* Tex.R. Evid. 702 (stating that evidence should be admitted, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."). Proving reliability requires that the proponent establish: (1) the underlying scientific technique is valid; (2) the technique applying the theory is valid; and (3) the technique has been properly applied on the occasion in question. *Kelly,* 824 S.W.2d at 573.

■ In *Nenno v. State,* 970 S.W.2d 549, 560 (Tex.Crim.App.1998), *overruled on*

*other grounds, State v. Terrazas,* 4 S.W.3d 720 (Tex.Crim.App.1999), the Court of Criminal Appeals determined that the *Kelly* inquiries could not easily be applied to analyze soft sciences where the validity of a theory or technique may be roughly accurate, but somewhat misleading. *Id.* at 560–61. When soft sciences, such as psychology, are at issue, the trial court should inquire: (1) whether the field of expertise is legitimate; (2) whether the subject matter of the expert's testimony is within the scope of that field; and (3) whether the expert's testimony properly relies upon or uses the principles involved in that field. *Id.* at 561. The court further emphasized that the reliability question under *Kelly* and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), is a flexible one and that the general approach of the rules of evidence is to relax the traditional barriers to opinion testimony. *Nenno,* 970 S.W.2d at 561; *see also Daubert,* 113 S.Ct. at 2794–95.

In applying this test to Dr. Glenmullen's testimony, we note that at the beginning of the hearing on its reliability the parties agreed that he was an expert and the State did not challenge the fact that psychology is a recognized health-care field. Therefore, the third inquiry, whether Dr. Glenmullen had properly relied on or used the principles involved in the field of psychology, was the only issue of reliability before the trial court. Dr. Glenmullen testified that he reviewed all of the police records of the family violence, the CPS records of investigations of domestic violence and sexual abuse, E.C.L.'s school records, and medical records from each of the mental-health professionals who had treated E.C.L. He testified that records of this kind are the type of information that a psychiatrist or psychologist relies on in making an evaluation of persons to whom they provide mental-health care.

At the conclusion of the hearing, the prosecutor stated, "I do not dispute that Dr. Glenmullen is an expert. Nor do I—I guess, I don't have any issue with the methodology that he has relied upon." The prosecutor further stated, "I'm not saying that his opinion isn't well based in fact or whatever." Because the prosecutor did not object to Dr. Glenmullen's methodology at trial, no further record about it was developed.

The State relies on *McGann v. State,* 30 S.W.3d 540 (Tex.App.-Fort Worth 2000, pet. ref'd), in its argument that Dr. Glenmullen's testimony was not reliable. In that case, the court found that the evidence McGann sought to elicit in front of the jury was unreliable because it had no basis in sound scientific methodology. *Id.* at 546–47. In this case, Dr. Glenmullen testified that his analysis was based on his more than twenty years' experience in psychology and his meticulous examination of E.C.L.'s records. We conclude that Dr. Glenmullen's methodology was sound and that his testimony was admissible.

## C. The exclusion of Dr. Glenmullen's testimony affected E.C.L.'s substantial rights.

 Having found that Dr. Glenmullen's testimony was admissible, we turn to whether the erroneous exclusion of that evidence was harmful to E.C.L. A nonconstitutional error that does not affect substantial rights must be disregarded. Tex. R.App. P. 44.2(b). The erroneous admission of evidence does not affect substantial rights if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect. *Motilla v. State,* 78 S.W.3d 352, 355 (Tex.Crim.App.

2002). In assessing the likelihood that the error adversely affected the jury's decision, the appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error, and how it might be considered in connection with other evidence in the case. *Morales v. State*, 32 S.W.3d 862, 867 (Tex.Crim.App. 2000). The reviewing court may also consider the jury instructions, the State's theory and any defensive theories, closing arguments, and even voir dire, if applicable. *Id.*

 In reviewing whether E.C.L.'s rights were substantially affected, it is important to consider E.C.L.'s first three issues challenging the trial court's denial of his requested jury instructions on justification defenses. A defendant is entitled to an instruction on any properly requested defensive issue raised by the evidence, regardless of whether the evidence is weak or strong, unimpeached or contradicted, or credible or not credible. *Granger v. State*, 3 S.W.3d 36, 38 (Tex.Crim.App.1999). If a defensive theory is raised, and the trial court is timely and properly requested to instruct the jury on the theory, the trial court must instruct the jury on the raised defensive theory. *Booth v. State*, 679 S.W.2d 498 500 (Tex.Crim.App.1984). The jury alone has the responsibility to decide whether to accept or reject a properly raised defensive theory. *Id.*

E.C.L. requested that the court charge the jury on the defenses of necessity, self-defense and defense of a third person. Article 38.36(b) applies only to the justification defenses found in sections 9.31, 9.32, and 9.33 of the Penal Code. Tex.Code Crim. Proc. Ann. art. 38.36(b). Self-de-

fense is codified in section 9.31(a) of the Penal Code and provides:

Except as provided in Subsection (b), a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force.

Tex. Penal Code Ann. § 9.31(a).

Defense of another is found in section 9.32 of the Penal Code, which provides:

(a) A person is justified in using deadly force against another;

(1) if the actor would be justified in using force against the other under Section 9.31; and

(2) when and to the degree the actor reasonably believes the deadly force is immediately necessary;

(A) to protect the actor against the other's use or attempted use of unlawful deadly force; or

(B) to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery.

Tex. Penal Code Ann. § 9.32(a).

E.C.L. claimed at trial that he had been physically and verbally abused for most of his life. He believed he had been sexually abused and thought his brother was either being sexually abused or would be sexually abused when they arrived at their father's house. The evidence showed the degree of abuse suffered by E.C.L. when he went to his father's house each week. E.C.L. also presented evidence that he had tried to retreat by resisting visitation with Lohstroh on three previous occasions, but law-enforcement officers were summoned to

force him to leave with his father. E.C.L. attempted to introduce evidence, through expert testimony, which would explain E.C.L.'s fear at the time he shot his father.

The State objected to E.C.L.'s requested charge because he had presented no evidence that he believed force was immediately necessary to protect himself and/or his brother. The State argued that, as a matter of law, the evidence does not indicate that there existed some harm that was at the point of occurring and which necessitated a split-second decision on the part of E.C.L. In excluding Dr. Glenmullen's testimony that E.C.L. believed force was immediately necessary and that a reasonable person in his circumstances could not retreat, the trial court prevented E.C.L. from presenting the evidence necessary to support a charge on the justification defenses.

The State relies on the Amarillo Court of Appeals' decision in *Contreras v. State*, 73 S.W.3d 314 (Tex.App.-Amarillo 2001, pet. ref'd), for the proposition that the evidence did not support charges on self-defense and defense of another. In *Contreras*, a child who suspected the decedent was sexually abusing her sister and was afraid he would abuse her next, stabbed the decedent while he was sleeping. *Id.* at 316. In that case, the court held there was no evidence showing the immediacy of any threat posed by the victim. *Id.* at 319. For that reason, the court affirmed the trial court's denial of the requested charges. *Id.* at 319–20.

*Contreras* is distinguishable from this case for a number of reasons. First, in *Contreras* there was no evidence of a long history of domestic violence as in this case. Further, there was no evidence that the defendant in *Contreras* had attempted to escape her abuser, or that she had been forced by law-enforcement officers to live with her abuser. In *Contreras*, the defendant stabbed the victim in his sleep; therefore, there was no evidence of an immediate threat. Finally, in *Contreras*, the trial court permitted an expert to testify on the defendant's fear of imminent harm and her belief that force was immediately necessary. *Id.* at 318–19.

The trial court's exclusion of Dr. Glenmullen's expert testimony directly affected the court's decision not to charge the jury on the justification defenses. The trial court's refusal to instruct the jury on E.C.L.'s right to assert self-defense and defense of another harmed E.C.L. because the trial court's refusals denied him the opportunity of requiring the jury to find against these defenses before assessing his guilt for the charged offenses. The jury was not instructed on justifications that would have required acquittal if the jury resolved these factual issues in E.C.L.'s favor. *See Boget v. State*, 40 S.W.3d 624, 627–28 (Tex.App.-San Antonio 2001), *aff'd*, 74 S.W.3d 23 (Tex.Crim.App.2002). Because E.C.L.'s substantial rights were affected by the exclusion of Dr. Glenmullen's testimony, we sustain appellant's fourth issue.

We reverse the judgment of the trial court and remand the cause for a new trial.