Motion for Rehearing Overruled; Reversed and Remanded and Opinion on
Rehearing filed February 12, 2009








 

Motion
for Rehearing Overruled; Reversed and Remanded and Opinion on Rehearing filed
February 12, 2009.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-06-01106-CV

____________

 

IN THE MATTER OF E.C.L.

 



 

On Appeal from the 315th
District Court

Harris County, Texas

Trial Court Cause No. 2004-08069J

 



 

O P I N I O N   O N   R E H E A R I N G

Appellant=s motion for rehearing is overruled.  The
opinion issued December 11, 2008, is withdrawn and the following opinion is
substituted therefor.








Appellant E.C.L. was charged with engaging in delinquent
conduct for fatally shooting his father, Rick Lohstroh.  A jury found he
engaged in delinquent conduct and assessed punishment at ten years= confinement in
the Texas Youth Commission with a possible transfer to the Texas Department of
Criminal Justice.  In ten issues, he contends the trial court erred in (1)
denying requested jury instructions on the defenses of necessity, self-defense,
and defense of others, (2) excluding expert testimony, (3) denying requested
jury instructions on lesser-included offenses, and (4) overruling his
objections to prosecutorial misconduct.  E.C.L. further contends that his
sentence is unconstitutional.  We reverse and remand for a new trial.

I.  Background

Dr. Rick Lohstroh and Mrs. Deborah Geisler were married on
June 16, 1989.  Almost from the beginning of their marriage, Lohstroh and
Geisler verbally and physically abused each other to the degree that peace
officers were called to their home on more than 20 occasions resulting in the
arrest of both spouses at varying times.  

On January 21, 1994, Geisler gave birth to E.C.L., their
first son.  K.L., appellant=s brother, was born two years later. 
Geisler testified that during their marriage, Lohstroh was arrested seven
times.  E.C.L. was present on all but one of those occasions.  Moreover, both
children witnessed several instances in which their parents were abusive to
each other.  

On one such occasion, when E.C.L. was six years old, his
parents were engaged in an argument that escalated into Lohstroh wielding a
hammer while chasing Geisler through the house.  Geisler ran into the master
bedroom and Lohstroh pinned her to the bed with one arm against her throat and
the hammer in the other hand.  E.C.L. followed his parents into the bedroom,
picked up the phone, and begged his mother to call the police.  The police were
eventually summoned, but neither party was arrested. 








Another incident in which police were called occurred on
January 2, 2002.  Geisler had scheduled a family outing to play laser tag in
celebration of E.C.L.=s eighth birthday.  Lohstroh thought he
had been excluded from the party and became angry.  Both parents argued about
the trip to laser tag and began shouting at each other.  Lohstroh picked up a
burrito and threw it at Geisler.  Geisler ducked and the burrito hit the
floor.  While his parents were still arguing, E.C.L. retrieved a small broom
and dust pan and began to clean up the spilled food.  Lohstroh became angry,
picked up the broom and dust pan, and threw them at E.C.L.  The police later
interviewed both E.C.L. and his brother about the incident.  Lohstroh was
arrested and charged with assault.  Afterward, Lohstroh moved out of the
parties= residence and, on
January 30, 2002, filed for divorce. 

On April 1, 2002, Geisler discovered E.C.L. and his brother
together, both naked from the waist down.  She testified that they were
discussing Asexual types of behavior.@  When she asked
them why they were behaving in that way, E.C.L. said that someone had taught
him to do that.  After questioning E.C.L. further, Geisler reported to Children=s Protective
Services (CPS) that E.C.L. had been sexually abused by Lohstroh in a motel room
in Webster.  CPS in turn referred the report to the Webster Police Department. 
This began a long investigation into alleged sexual abuse, which required
E.C.L. to be interviewed by CPS workers, a counselor, and police officers.  The
police report indicated that the charges could not be substantiated and the
Harris County District Attorney=s Office filed no charges.  Geisler also
reported the alleged abuse to authorities in Galveston County, claiming that it
had occurred in their home in Friendswood.  The Galveston County District
Attorney=s Office also
declined to file charges.  Although no charges were filed in either county, Dr.
Joseph Glenmullen, a psychiatrist who examined E.C.L., testified that E.C.L.
believed he had been sexually abused.  








As a result of the sexual-abuse allegations, Lohstroh was
denied visitation with the children, but in September 2002, he regained
visitation rights.  On October 4, 2002, Lohstroh retrieved both boys from
after-school care in violation of a protective order.  As a result, criminal
trespass charges were filed against him.  On November 14, 2002, Geisler
reported to the police that Lohstroh had grabbed E.C.L. by his arm and
forcefully pulled him into Lohstroh=s car.  On the
drive to Lohstroh=s home, E.C.L. said he did not want to go
to his father=s house.  Lohstroh hit E.C.L. while they were in the
car, and after they arrived at Lohstroh=s home, he hit
E.C.L. so hard that E.C.L. fell and hit his head on the armrest of a sofa. 
Charges were not filed against Lohstroh.  After these allegations were made,
E.C.L. began seeing Dr. Sherri Corning, a psychologist.  Dr. Corning treated
E.C.L. for about one and a half years.

On November 18, 2002, Geisler went to Lohstroh=s girlfriend=s place of
business, told the girlfriend=s colleagues that Lohstroh was a child
molester, and told the girlfriend to stay away from her children.  As the
girlfriend left work that day, Geisler and the two boys were in Geisler=s car outside the
girlfriend=s place of employment.  Geisler followed the
girlfriend in her vehicle, driving recklessly, running red lights, and
following at an unsafe distance until the girlfriend neared a police station. 
As a result of this incident, Geisler was charged with neglectful supervision.

On April 8, 2003, E.C.L. told his mother that Lohstroh had
been very angry with him two days earlier when E.C.L. refused to take a bath. 
E.C.L. reported that Lohstroh chased him into the bathroom with a belt, grabbed
his arm, and forcibly removed his shorts.  Lohstroh then beat E.C.L. across the
buttocks.  Lohstroh then grabbed E.C.L. by the arm, jerked him off his feet,
and attempted to force him into the bathtub, leaving a bruise on E.C.L.=s elbow.  E.C.L.
dressed himself and ran out of the bathroom.  When Geisler reported this
incident to the police, E.C.L. reported to them that he was afraid to take a
bath because of a previous molestation by his father.  

On April 24, 2003, peace officers were dispatched to the
mother=s home where
Geisler reported that E.C.L. had been at his father=s apartment for
visitation the previous day and that Lohstroh had hit E.C.L. in the face. 
E.C.L. said he asked his father four times if he could play a video game and
each time his father told him no.  After the fourth time, Lohstroh hit E.C.L.
in the face.  The officer examined E.C.L.=s face and did not
see any marks or bruises.  In his report, the officer stated, ADue to my past
experiences with Mrs. Geisler I did not see any reasons to pursue the issue of
assault on the nine year old boy.  I told Mrs. Geisler that [E.C.L.]=s father had the
right to discipline his child as long as it was not excessive.@








In another police report filed May 14, 2003, Geisler
accused Lohstroh=s girlfriend of physically abusing K.L. 
In that report, the officer recounted the previous assault against E.C.L. and
noted:

[Father] has some history of sexual
abusing [E.C.L.] in the past and CPS investigated. [Father] also has some
history of physically abusing [E.C.L.] as well.  There is concern that [E.C.L.]
and [K.L.] are still at risk for physical abuse especially because [Father] has
a condition called an intermittent explosive disorder.  This causes him to have
outbursts of anger and [Father] is not taking his medication.

The
officer concluded that both parents Ahave
inappropriately disciplined 9 and 6 [year olds].  There is a lot of history
with this family involving physical abuse as well as sexual abuse.  [Father] is
not medicating his mental health disorder and this could place the children at
further risk.@

On May 21, 2003, the divorce became final.  Lohstroh and
Geisler shared custody of the children on alternating weeks.  In other words,
the children lived with their father for one week and their mother the next
week.  Every Friday the children switched homes.  During the school year the
transition took place at school.  During school breaks, however, each parent
would pick up the children at the other=s home.








Deputy Harris County Constable Christopher Kithas testified
that he was called to Geisler=s home on three occasions to assist in the
transfer of custody.  Each time the children did not want to get in the car
with their father.  On the first occasion, the children were inside the house
and would not come out.  Eventually Deputy Kithas was able to coax them out and
convince them to go with their father.  On another occasion, Lohstroh was
sitting in the driver=s seat of the car, K.L. was sitting in the
back seat, and E.C.L. was outside of the car spraying Lohstroh with a water
hose.  Again, the boys eventually left with their father.  On a third occasion,
the boys refused to get in the car and Lohstroh finally left without them.  On
each occasion, Geisler remained in the house and did not assist the children or
their father with the transfer of custody. K.L. testified that on one occasion
he and E.C.L. jumped from their father=s moving car after
Lohstroh began to drive away because they did not want to go with him.

On December 19, 2003, Geisler reported to the Friendswood
Police Department that her children had witnessed Lohstroh strike his
girlfriend.  The police interviewed both children.  E.C.L. said he had seen his
father strike his girlfriend after an argument about the dishes not being
washed.  According to the police report, while the investigating officer was
questioning E.C.L., Geisler interrupted and said, AWhat I=m really concerned
about is that R. Lohstroh spanked my sons.@  The officer
asked E.C.L. about the spanking and E.C.L. reported that he had been struck
three times with a leather belt because he and his brother would not go to
bed.  Geisler then told the officer that as Lohstroh struck the children, he
said, AI=m going to kill y=all.@  Neither of the
children initially reported having heard this, but when the officer asked if
Lohstroh had said it, they first looked at their mother and then responded, AYes.@  After a thorough
interview, the officer referred the incident to the detective division. 








In July 2004, E.C.L. began to see Dr. Diane
Treadwell-Deering, a psychiatrist at Texas Children=s Hospital.  Dr.
Treadwell-Deering determined that E.C.L. suffered some signs of depression, but
was not clinically depressed.  After his second appointment, Dr.
Treadwell-Deering prescribed Prozac, an anti-depressant medication.  The
prescription dose started at 10 milligrams and was gradually increased to 20
milligrams.  Because of the custody arrangement, Geisler expressed concern that
E.C.L. would not receive the medication during the weeks he lived with his
father.  Dr. Treadwell-Deering attempted to contact Lohstroh and discuss the
medication with him, but Lohstroh did not return her calls.  Because she was
unable to communicate with Lohstroh, Dr. Treadwell-Deering prescribed a
once-weekly 90-milligram dose of Prozac to be given to E.C.L. by his mother
every Friday.[1] 
Dr. Treadwell-Deering recommended that E.C.L. see a psychologist.

On Friday, August 27, 2004, Geisler administered to E.C.L.
his second 90-milligram dose of Prozac.  That same day, E.C.L. and his brother
had an appointment with Dr. Charles Patrick Brady, a psychologist.  In
preparation for the appointment, Geisler told E.C.L. to write down anything he
wanted to discuss with Dr. Brady.  In the document he prepared, E.C.L. stated:

1.       I=m angry because I have to go live at my dads Arick=s@.  It upsets me a lot to stay at rick=s.

2.       Rick yells and screams at us a lot.

3.       Katy [Lohstroh=s girlfriend] calls us names like
turd, brats, pigs, nerds.  There is a lot of yelling at rick=s house.

4.       Rick hits us swing his fists at our head,
w[h]ips us with belts, he=s hit me and knocked me down he
hits because he is mad.  he=s given us bruises and cuts.

5.       he yells at katy using bad word he has also
hit her and Katy has hit him Asometimes@. He also yells about her smoking.

6.       When rick comes to pick us up at mom=s house, He yells and screams at
us.  He grabs [K.L.], hurting [K.L.] and forces [K.L.] into his car.  I try to
protect [K.L.].

7.       Rick yells and screams bad words at other
drivers.  Rick swerves the car, his slams on the brakes in front of other
drivers to make them mad or because he is mad.  He also does bad hand movements
to other drivers and other people.








8.       One time Katy shoved me out the back door
at night and locked me out of the house. [K.L.] was the one who let me back in
the house she broke glass.  Katy w[h]ips [K.L.] with a belt and I can not stop
her from hurting [K.L.].

9.       Rick has pictures of naked women on his
computer that pop up.  Then Rick has tapes of naked women.

10.     I think Rick is doing bad things to [K.L.]
like he did to me.  When I come home from school sometimes rick has [K.L.] in
ricks bed and rick is in his underwear. [K.L.] is quiet and sad.  Rick is
acting strange. [K.L.] has told me what rick has done and I can not protect
[K.L.] from this happening.  No one could protect me when this was happening.

11.     [K.L.] and I have both been sick and rick
does not take us to see our doctor.  I had fever for 4 days and rick did not
help me. [K.L.] had fever a skin infection, sore throat, and rick did not take
us to the doctors.

12.     I am
afraid of rick and living at ricks house.  I wish I could make things better
and protect [K.L.].  I want to live at my mom house so bad things don=t countinue [sic]
to [K.L.] and me.  (Katy carried a machete around rick=s house and said AI was going to rip
up your dad@.)  I don=t feel safe at
rick=s house because he
is angery [sic] a lot and is doing bad things.

Dr. Brady discussed the contents of the note with E.C.L. 
He asked specifically about the allegations of sexual assault and determined
that E.C.L. believed that Lohstroh had sexually assaulted him.  Dr. Brady also
determined that E.C.L. believed that Lohstroh was going to sexually assault his
brother.  After meeting with E.C.L., Dr. Brady met with Geisler and instructed
her that she should report to CPS both the allegations in E.C.L.=s note and those
he made in the session concerning sexual assault.  








On the way home from Dr. Brady=s office, Geisler
asked K.L. about the sexual-assault allegations.  When K.L. initially denied
having been assaulted, E.C.L. became agitated and angry with him.  E.C.L. later
admitted to Dr. Glenmullen that the agitation was out of character for him. 
Also on the way home, Geisler=s car ran out of gas, which required
Geisler and the children to wait one to two hours for a tow truck to take them
to a service station.  As soon as the children arrived home, they had to
prepare to move to their father=s house for the next week.

While the children were preparing to leave, Geisler called
CPS to report the allegations of sexual abuse.  While on the telephone with
CPS, Geisler received a call from Lohstroh informing her that he had arrived
and was ready for the children.  Geisler and Lohstroh then engaged in a heated
argument over the telephone.  K.L. testified that E.C.L. went outside to the
car with his backpack while Geisler was tying K.L.=s shoes.  K.L.
heard three loud pops and E.C.L. came back in the house with a gun in his
hand.  With his other hand, E.C.L. made an AOK@ sign.  Geisler
took the gun away from E.C.L. and K.L. went to the bedroom because he was
frightened.  Geisler asked E.C.L. what he had done and he replied, AI shot him.@

Geisler called 911 and told responding officers that Lohstroh
was alive, but his breathing was labored and shallow.  Emergency medical
technicians attempted to treat Lohstroh, but by the time they arrived he had
stopped breathing.  An autopsy revealed that Lohstroh died as a result of
gunshot wounds to the back.  Police officers separated E.C.L. from his mother
and his brother and placed bags on each of their hands.  Tests revealed gunshot
residue on both of E.C.L.=s hands and on Geisler=s right hand.[2] 









At 8:30 that evening, E.C.L. gave a statement to Harris
County Sheriff=s detectives. As part of the statement, E.C.L. told
the detectives that he talked to psychologists about things that bother him. 
When asked what things bother him, he responded, AA lot of things
like the abuses, Rick abuses me and [K.L.].  I think he=s sexually
molesting [K.L.] and that bothers me a lot.@  E.C.L. described
the sexual abuse just as he had described it to CPS workers, psychologists, and
other police officers.  He told the detectives that he was sexually abused when
he was seven years old.  E.C.L. also stated that Lohstroh hits them when he is
mad.  He said that he does not like the way the Prozac makes him feel and that
it makes him more talkative and A[a] little on the
side of angry.@  The detectives asked E.C.L., AWhat happened
after Rick got here today?@  E.C.L. whispered in response, AI was mad that I
had to go with him so I shot him.@  E.C.L. said he
retrieved the gun from his mother=s closet in her
bedroom, loaded it, and put it in his backpack.  When Lohstroh arrived, E.C.L.
said he did not really want to go with his father, but he went outside, sat in
the back seat of the car, put his hand in the backpack, and shot Lohstroh. 
After the first shot, he took the gun out of the backpack.  Lohstroh began
screaming, which scared him and he shot two more times while in the car, then
got out of the car and shot once toward the back door.  He then ran inside the
house where his mother took the gun away from him.  When asked whether he was
afraid of Lohstroh, E.C.L. responded, AYes, oh yeah I was
scared of him.  When he=d get angry I was real scared that he
would turn around and just go crazy on us hit us and abuse us.@  When asked why
his father came to get him every week, E.C.L. responded, AI don=t know.  I don=t, I just think he
thinks that we=re like a prize to him not as loved but like he as if
he were playing a game.@

E.C.L. was charged and convicted with engaging in
delinquent conduct by shooting Lohstroh with a deadly weapon.  The jury
assessed punishment at ten years= confinement in
the Texas Youth Commission with a possible transfer to the Texas Department of
Criminal Justice.  In ten issues, E.C.L. challenges his conviction on the
grounds that the trial court erred in (1) denying his requested jury
instructions on the defenses of necessity, self-defense, defense of another, and
the lesser-included offenses of manslaughter and criminally negligent homicide,
(2) improperly excluding expert testimony, and (3) overruling his objections to
prosecutorial misconduct.  Because the issues of expert testimony and jury
instructions on the justification defenses are dispositive, we will address
only those issues.








II.  Evidence That Force was Immediately
Necessary

In his fourth issue, E.C.L. contends the trial court erred
in excluding certain expert testimony.  At trial, E.C.L. attempted to use
expert testimony to produce evidence of the justification defenses of
self-defense and defense of another.  See Tex. Penal Code Ann. '' 9.31 & 9.32
(Vernon Supp. 2008). 

A.      Standard of Review

Under article 38.36 of the Texas Code of Criminal
Procedure, if a defendant raises a defense of justification provided by section
9.31, 9.32, or 9.33 of the Penal Code, the defendant, to establish his
reasonable belief that use of force or deadly force was immediately necessary,
shall be permitted to offer (1) relevant evidence that the defendant had been
the victim of family violence committed by the deceased, and (2) relevant
expert testimony regarding the defendant=s state of mind at
the time of the offense.  Tex. Code Crim. Proc. Ann. art. 38.36(b) (Vernon
2005).  A trial court=s ruling on the admissibility of evidence
is subject to an abuse-of-discretion standard on appeal.  Sexton v. State,
93 S.W.3d 96, 99 (Tex. Crim. App. 2002).  We uphold the trial court=s ruling if it is
permissible under any theory applicable to the case. Romero v. State,
800 S.W.2d 539, 543 (Tex. Crim. App. 1990).

B.      The trial
court erred in excluding expert testimony on E.C.L.=s belief that
force was immediately necessary.

E.C.L. attempted to introduce the expert testimony of Dr.
Joseph Glenmullen that because E.C.L. suffered from battered-child syndrome, he
believed his conduct was immediately necessary to avoid harm to himself or his
brother.  The trial court excluded any testimony from Dr. Glenmullen about
whether E.C.L. believed force was immediately necessary at the time he shot his
father.  E.C.L. proffered expert testimony from Dr. Glenmullen that:








$                  
E.C.L.=s mental condition
and state of mind was such at the time he shot his father that he reasonably
believed he was justified in using force or deadly force to protect himself or
his brother against the unlawful acts of his father.

$                  
At
the time he shot his father, E.C.L. did not believe he could retreat.

Ordinarily, the defendant is the only source of evidence of
his or her state of mind at the time the offense is committed.  See Osby v.
State, 939 S.W.2d 787, 791 (Tex. App.CFort Worth 1997,
pet. ref=d).  But, article
38.36(b) of the Code of Criminal Procedure authorizes admission of Arelevant expert
testimony regarding the condition of the mind of the defendant at the time of
the offense@ if the defendant had been a victim of family violence
and if the defendant raised the issue of self-defense or defense of another. 
Tex. Code Crim. Proc. Ann. art. 38.36(b) 

The reference to expert testimony in article 38.36(b) is a
codification of Fielder v. State, 756 S.W.2d 309 (Tex. Crim. App.
1988).  In Fielder, the Court of Criminal Appeals held that expert
testimony about the psychological effects of marital abuse is relevant to a
defendant=s claim of self-defense because the expert testimony
could assist the jury in its decision concerning whether the defendant
reasonably believed that deadly force was immediately necessary.  Id. at
318B20.  The court
found that expert testimony was relevant because the average lay person Ahas no basis for
understanding the conduct of a woman who endures an abusive relationship.@  Id. at
321.  








In this case, the State attempts to distinguish Fielder
because it claims there is no evidence to suggest that E.C.L. believed he
immediately needed to respond to an imminent threat from his father.  To the
contrary, there was sufficient evidence introduced from which an expert could
opine as to E.C.L.=s state of mind.  The average lay person
had no basis for understanding why E.C.L. would fear for his life by simply
getting into the car with his father.  At the time E.C.L. sought to introduce
Dr. Glenmullen=s expert testimony, the jury had heard that E.C.L.
spent most of his 10 years being verbally and physically abused by his father. 
Although prosecutors never pursued any allegations of sexual abuse in the
courts, several experts testified that E.C.L. believed he had been sexually
abused.  On at least one occasion E.C.L. jumped from a moving vehicle to avoid
going with his father.  On three occasions when E.C.L. expressed his desire not
to go with his father, law-enforcement officers were called to force E.C.L. to
get into his father=s car.  To the extent that an expert can
explain a child=s endurance of this level of abuse and the
nature of his fear at the time of the shooting, his testimony was of Aappreciable aid@ to the trier of
fact.  See id. at 321.  

The State contends that Dr. Glenmullen=s testimony should
have been excluded for the same reasons similar testimony was excluded in Werner
v. State, 711 S.W.2d 639 (Tex. Crim. App. 1986).  In that case, Werner
sought to admit expert testimony on the Aholocaust survivors= syndrome@ in support of his
claim of self-defense.  The court held, however, that Werner, an adult who had
no prior relationship with the deceased, had not presented evidence that he
reasonably believed it necessary to shoot the deceased to defend himself
against deadly force.  Id. at 644B45.  The court
held that Werner was not entitled to admission of the expert testimony because
the evidence did not raise self-defense as an issue.  Id. at 645. 

In this case, E.C.L. sought to introduce evidence that a
reasonable person will have a just apprehension of fear of another with whom he
has had prior violent conflict.  Dr. Glenmullen=s testimony was
relevant to E.C.L.=s state of mind, which had been profoundly
affected by the sum of his experiences with his father.  Lay people, especially
adults, who have not experienced abuse for most of their lives do not have a
frame of reference to fully understand why a child in E.C.L.=s position might
have felt that deadly force was immediately necessary to protect himself and/or
his brother.  Therefore, Dr. Glenmullen=s testimony was
admissible under article 38.36(b) to aid the jury in understanding E.C.L.=s fear at the time
of the offense.  See Fielder, 756 S.W.2d at 321; Tex. Code Crim. Proc.
Ann. art. 38.36(b).








In its brief on appeal, the State also contends that the
trial court=s ruling was correct because E.C.L. failed to
establish Dr. Glenmullen=s reliability as an expert.  See McGann
v. State, 30 S.W.3d 540, 546B47 (Tex. App.CFort Worth 2000,
pet. ref=d).  In
determining the admissibility of novel scientific evidence, the threshold
question asked under both Rule 702 and Kelly v. State is Awhether that
testimony will help the trier of fact understand the evidence or determine a
fact in issue.@  Kelly, 824 S.W.2d 568, 572 (Tex. Crim. App.
1992); see also Tex. R. Evid. 702 (stating that evidence should be
admitted, A[i]f scientific, technical, or other specialized
knowledge will assist the trier of fact to understand the evidence or to
determine a fact in issue.@).  Proving reliability requires that the
proponent establish: (1) the underlying scientific technique is valid; (2) the
technique applying the theory is valid; and (3) the technique has been properly
applied on the occasion in question.  Kelly, 824 S.W.2d at 573.  

In Nenno v. State, 970 S.W.2d 549, 560 (Tex. Crim.
App. 1998), overruled on other grounds, State v. Terrazas, 4
S.W.3d 720 (Tex. Crim. App. 1999), the Court of Criminal Appeals determined
that the Kelly inquiries could not easily be applied to analyze soft
sciences where the validity of a theory or technique may be roughly accurate,
but somewhat misleading.  Id. at 560B61.  When soft
sciences, such as psychology, are at issue, the trial court should inquire: 
(1) whether the field of expertise is legitimate; (2) whether the subject
matter of the expert=s testimony is within the scope of that
field; and (3) whether the expert=s testimony
properly relies upon or uses the principles involved in that field.  Id.
at 561.  The court further emphasized that the reliability question under Kelly
and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct.
2786, 125 L.Ed.2d 469 (1993), is a flexible one and that the general approach
of the rules of evidence is to relax the traditional barriers to opinion
testimony.  Nenno, 970 S.W.2d at 561; see also Daubert, 113 S.Ct.
at 2794B95.








In applying this test to Dr. Glenmullen=s testimony, we
note that at the beginning of the hearing on its reliability the parties agreed
that he was an expert and the State did not challenge the fact that psychology
is a recognized health-care field.  Therefore, the third inquiry, whether Dr.
Glenmullen had properly relied on or used the principles involved in the field
of psychology, was the only issue of reliability before the trial court.  Dr.
Glenmullen testified that he reviewed all of the police records of the family
violence, the CPS records of investigations of domestic violence and sexual
abuse, E.C.L.=s school records, and medical records from each of the
mental-health professionals who had treated E.C.L.  He testified that records
of this kind are the type of information that a psychiatrist or psychologist
relies on in making an evaluation of persons to whom they provide mental-health
care.  

At the
conclusion of the hearing, the prosecutor stated, AI do not dispute that Dr. Glenmullen
is an expert.  Nor do I B I guess, I don=t have any issue with the methodology
that he has relied upon.@  The prosecutor further stated, AI=m not saying that his opinion isn=t well based in fact or whatever.@  Because the prosecutor did not
object to Dr. Glenmullen=s methodology at trial, no further record about it was developed.


The State relies on McGann v. State, 30 S.W.3d 540
(Tex. App.CFort Worth 2000, pet. ref=d), in its
argument that Dr. Glenmullen=s testimony was not reliable.  In that
case, the court found that the evidence McGann sought to elicit in front of the
jury was unreliable because it had no basis in sound scientific methodology.  Id.
at 546B47.  In this case,
Dr. Glenmullen testified that his analysis was based on his more than twenty
years= experience in
psychology and his meticulous examination of E.C.L.=s records.  We
conclude that Dr. Glenmullen=s methodology was sound and that his
testimony was admissible.  

C.      The exclusion of Dr.
Glenmullen=s testimony affected E.C.L.=s substantial
rights.








Having found that Dr. Glenmullen=s testimony was
admissible, we turn to whether the erroneous exclusion of that evidence was
harmful to E.C.L.  A nonconstitutional error that does not affect substantial
rights must be disregarded.  Tex. R. App. P. 44.2(b).  The erroneous admission
of evidence does not affect substantial rights if the appellate court, after
examining the record as a whole, has fair assurance that the error did not
influence the jury, or had but a slight effect.  Motilla v. State, 78
S.W.3d 352, 355 (Tex. Crim. App. 2002).  In assessing the likelihood that the
error adversely affected the jury=s decision, the appellate
court should consider everything in the record, including any testimony or
physical evidence admitted for the jury=s consideration,
the nature of the evidence supporting the verdict, the character of the alleged
error, and how it might be considered in connection with other evidence in the
case.  Morales v. State, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000).  The
reviewing court may also consider the jury instructions, the State=s theory and any
defensive theories, closing arguments, and even voir dire, if applicable.  Id.

In reviewing whether E.C.L.=s rights were
substantially affected, it is important to consider E.C.L.=s first three
issues challenging the trial court=s denial of his
requested jury instructions on justification defenses.  A defendant is entitled
to an instruction on any properly requested defensive issue raised by the
evidence, regardless of whether the evidence is weak or strong, unimpeached or
contradicted, or credible or not credible.  Granger v. State, 3 S.W.3d
36, 38 (Tex. Crim. App. 1999).  If a defensive theory is raised, and the trial
court is timely and properly requested to instruct the jury on the theory, the
trial court must instruct the jury on the raised defensive theory.  Booth v.
State, 679 S.W.2d 498 500 (Tex. Crim. App. 1984).  The jury alone has the
responsibility to decide whether to accept or reject a properly raised
defensive theory.  Id.

E.C.L. requested that the court charge the jury on the
defenses of necessity, self-defense and defense of a third person.  Article
38.36(b) applies only to the justification defenses found in sections 9.31,
9.32, and 9.33 of the Penal Code.  Tex. Code Crim. Proc. Ann. art. 38.36(b). 
Self-defense is codified in section 9.31(a) of the Penal Code and provides:








Except as provided in subsection
(b) of this section, a person is justified in using force against another when
and to the degree the actor reasonably believes the force is immediately
necessary to protect the actor against the other=s use or attempted
use of unlawful force.

Tex.
Penal Code Ann. ' 9.31(a).

Defense of another is found in section 9.32 of the Penal
Code, which provides:

(a)     A person is justified in using deadly force
against another;

(1)     if the actor would be justified in using
force agaisnt the other under Section 9.31; and 

(2)     when and to the degree the actor reasonably
believes the deadly force is immediately necessary;

(A)     to protect the actor against the other=s use or attempted use of unlawful
deadly force; or

(B)     to prevent
the other=s imminent commission of aggravated kidnapping,
murder, sexual assault, aggravated sexual assault, robbery, or aggravated
robbery.

Tex.
Penal Code Ann. ' 9.32(a).

E.C.L. claimed at trial that he had been physically and
verbally abused for most of his life.  He believed he had been sexually abused
and thought his brother was either being sexually abused or would be sexually
abused when they arrived at their father=s house.  The
evidence showed the degree of abuse suffered by E.C.L. when he went to his
father=s house each
week.  E.C.L. also presented evidence that he had tried to retreat by resisting
visitation with Lohstroh on three previous occasions, but law-enforcement
officers were summoned to force him to leave with his father.  E.C.L. attempted
to introduce evidence, through expert testimony, which would explain E.C.L.=s fear at the time
he shot his father. 








The State objected to E.C.L.=s requested charge
because he had presented no evidence that he believed force was immediately
necessary to protect himself and/or his brother.  The State argued that, as a
matter of law, the evidence does not indicate that there existed some harm that
was at the point of occurring and which necessitated a split-second decision on
the part of E.C.L.  In excluding Dr. Glenmullen=s testimony that
E.C.L. believed force was immediately necessary and that a reasonable person in
his circumstances could not retreat, the trial court prevented E.C.L. from
presenting the evidence necessary to support a charge on the justification
defenses.

The State relies on the Amarillo Court of Appeals= decision in Contreras
v. State, 73 S.W.3d 314 (Tex. App.CAmarillo 2001,
pet. ref=d), for the
proposition that the evidence did not support charges on self-defense and
defense of another.  In Contreras, a child who suspected the decedent
was sexually abusing her sister and was afraid he would abuse her next, stabbed
the decedent while he was sleeping.  Id. at 316.  In that case, the
court held there was no evidence showing the immediacy of any threat posed by
the victim.  Id. at 319.  For that reason, the court affirmed the trial
court=s denial of the
requested charges.  Id. at 319B20.

Contreras is distinguishable from this case for a
number of reasons.  First, in Contreras there was no evidence of a long
history of domestic violence as in this case.  Further, there was no evidence
that the defendant in Contreras had attempted to escape her abuser, or
that she had been forced by law-enforcement officers to live with her abuser. 
In Contreras, the defendant stabbed the victim in his sleep; therefore,
there was no evidence of an immediate threat.  Finally, in Contreras,
the trial court permitted an expert to testify on the defendant=s fear of imminent
harm and her belief that force was immediately necessary.  Id. at 318B19.  








The trial court=s exclusion of Dr.
Glenmullen=s expert testimony directly affected the court=s decision not to
charge the jury on the justification defenses.  The trial court=s refusal to
instruct the jury on E.C.L.=s right to assert self-defense and defense
of another harmed E.C.L. because the trial court=s refusals denied
him the opportunity of requiring the jury to find against these defenses before
assessing his guilt for the charged offenses.  The jury was not instructed on
justifications that would have required acquittal if the jury resolved these
factual issues in E.C.L.=s favor.  See Boget v. State, 40
S.W.3d 624, 627B28 (Tex. App.CSan Antonio 2001),
aff=d, 74 S.W.3d 23 (Tex. Crim. App. 2002). 
Because E.C.L.=s substantial rights were affected by the exclusion of
Dr. Glenmullen=s testimony, we sustain appellant=s fourth issue.

We reverse the judgment of the trial court and remand the
cause for a new trial.

 

 

 

/s/      Jeffrey V.  Brown

Justice

 

 

 

Panel consists of
Justices Yates, Anderson, and Brown.









[1]  At trial, E.C.L. asserted an
involuntary-intoxication defense alleging that 90 milligrams of Prozac was an
overdose for a ten-year-old or, in the alternative, that Geisler mistakenly
gave E.C.L. two 90-milligram capsules of Prozac on the day of the shooting. 
Under either theory, E.C.L. alleged that the side effects of Prozac caused him
to not be culpable for his actions.  This theory was submitted to the jury and
rejected.  On appeal, E.C.L. has not challenged the jury=s rejection of his involuntary-intoxication defense.





[2]  When initially asked, outside the presence of the
jury, whether she shot Lohstroh, Geisler did not immediately respond and
eventually invoked her Fifth Amendment privilege against self-incrimination. 
Later, in front of the jury, when asked again whether she shot Lohstroh,
Geisler answered, ANo.@  At trial,
appellant did not pursue the potential culpability of Geisler in the shooting.